# UNITED STATES DISTRICT COURT
### for the
Eastern District of California

**FILED**

**Jun 01, 2022**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.   2:22-mj-0089 JDP |
| | ) | |
| GEOVANY ESPINOZA | ) | |
| | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____12/8/2020_____ in the county of _____San Joaquin_____ in the
_____Eastern_____ District of _____California_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| **21 U.S.C. § 841(a)(1)** | **Distribution Over 500 Grams of a mixture or substance containing Methamphetamine** |

This criminal complaint is based on these facts:

See Affidavit of FBI Special Agent Brian Toy, attached hereto and incorporated by reference.

☒ Continued on the attached sheet.

_____
/s/ Brian Toy
*Complainant's signature*

Special Agent Brian Toy, FBI
*Printed name and title*

Sworn to me and signed via telephone.

Date: _____June 1, 2022_____

_____
*Judge's signature*

City and state: _____Sacramento, California_____

Jeremy D. Peterson, U.S. Magistrate Judge
*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT OF APPLICATIONS UNDER RULE 41 FOR WARRANTS**</u>

<u>**TO SEARCH AND SEIZE AND UNDER RULE 4 FOR WARRANTS TO ARREST**</u>

Table of Contents

I.    **INTRODUCTION** ..................................................................................................... 1

II.   **AFFIANT'S GENERAL TRAINING AND EXPERIENCE** ................................. 2

III.  **PROBABLE CAUSE** ................................................................................................ 5

   A.   Synopsis and Background ................................................................................ 5
   B.   The Confidential Source .................................................................................. 6
   C.   The TARGET SUBJECTS' Criminal Histories and Roles in the MONTES DTO ...... 7
   D.   Overt Acts Committed by TARGET SUBJECTS ...................................... 10
      *1.   MONTES and Currently Unidentified Suppliers* ............................................. 10
      *2.   MONTES and ANDRADE – Conspiracy to Distribute Cocaine* ..................... 13
      *3.   MONTES, GARCIA RUIZ, TINOCO, and HERNANDEZ—Conspiracy to Distribute*
      *Methamphetamine* ............................................................................................ 22
      *4.   December 8, 2020 – MONTES Sold the CS 4 lb. of Methamphetamine, Supplied by*
      *GARCIA-RUIZ and GARCIA-RUIZ's Supplier, ESPINOZA* ........................ 38
   E.   Additional Probable Cause to Support the Search of MONTES' RESIDENCE... 44
   F.   Probable Cause to Believe that MONTES Currently Resides at the MONTES'
   RESIDENCE, is Using MONTES' PHONE, and Drives MONTES' RED/SILVER FORD. 49
   G.   Probable Cause to Believe that GARCIA-RUIZ Uses GARCIA-RUIZ's PHONE. . 50
   H.   Probable Cause to Believe that ANDRADE Resides at ANDRADE'S RESIDENCE
   and uses ANDRADE'S PHONE. ...................................................................... 50
   I.   Probable Cause to Believe that ESPINOZA Uses ESPINOZA's PHONE. .............. 50

IV.  **TRAINING AND EXPERIENCE REGARDING CELLULAR TELEPHONES AND**
**PRECISE LOCATION DATA** ....................................................................................... 52

V.   **AUTHORIZATION REQUEST REGARDING APPLICATION FOR WARRANTS**
**TO OBTAIN PRECISE LOCATION DATA FROM A CELLULAR TELEPHONE** ........ 53

VI.  **REQUEST FOR SEALING** ....................................................................................... 54

VII. **CONCLUSION** ............................................................................................................ 54

# I.     <u>INTRODUCTION</u>

I, Brian Toy, Special Agent, U.S. Department of Justice, Federal Bureau of Investigation (FBI), being duly sworn, state:

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following people, premises, and property described below. This affidavit also supports my application for arrest warrants of the TARGET SUBJECTS for the offenses listed on the applications for arrest warrants.

| Attachment | Person/Property | Process Sought |
|---|---|---|
| **TARGET SUBJECTS** | | |
| A-1 | Neftali Castillo MONTES, DOB XX/XX/1981 | Complaint, Arrest warrant, & Search warrant |
| | Fidel ANDRADE, DOB XX/XX/1988 | |
| | Walter GARCIA-RUIZ, DOB XX/XX/1987 | Complaint & Arrest warrants |
| | Fernando Aldama TINOCO, DOB XX/XX/1973 | |
| | Jesus Horacio Ramirez HERNANDEZ, DOB XX/XX/1988 | |
| | Geovany ESPINOZA, DOB XX/XX/1989 | |
| **TARGET RESIDENCES** | | |
| A-2 | 2191 Orwood St, Stockton, CA 95205 ("MONTES' RESIDENCE") | Search warrant (person and evidence) |
| A-3 | 5301 E Main St, Stockton, CA 95215 ("ANDRADE'S RESIDENCE") | Search warrant (person only) |
| **TARGET VEHICLES** | | |
| A-4 | 1992 Ford pick-up, CA 8V18460 ("MONTES' RED/SILVER FORD") | Search warrant (person and evidence) |
| **TARGET CELLULAR PHONES** | | |
| A-5 | (209) 649-9267 ("MONTES' PHONE" aka TT#1) | Precise location data warrants (for arrest) |
| A-6 | (209) 594-6767 ("GARCIA-RUIZ's PHONE," aka TT#3) | |
| A-7 | (209) 954-6182 ("ANDRADE's PHONE," aka TT#2) | |
| A-8 | (661) 316-9777 ("ESPINOZA's PHONE") | |

2.     The people and property to be searched are further described in Attachments A-1 through

Affidavit                                             1

A-8.  The applications seeks to search them for the things described in Attachment B-1 through B-8. As explained throughout this affidavit, and specified on the relevant attachments, I believe these TARGET SUBJECTS have committed the TARGET OFFENSES described below. This affidavit also supports my application for arrest warrants for the TARGET SUBJECTS for these offenses.

| Count | Target Subjects | Target Offenses | Dates |
|-------|-----------------|-----------------|-------|
| I | MONTES & ANDRADE | Conspiracy to Distribute Cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) | 1/24/2020 – 10/13/2020 |
| II | MONTES, GARCIA-RUIZ, TINOCO, & HERNANDEZ | Conspiracy to Distribute Methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) | 10/6/2020 - 12/2/2020 |
| III | MONTES, GARCIA-RUIZ, & ESPINOZA | Distribution of Methamphetamine, in violation of 21 § 841(a)(1) | 12/8/2020 |

## II.    AFFIANT'S GENERAL TRAINING AND EXPERIENCE

3.      I, Brian Toy, Special Agent, U.S. Department of Justice, Federal Bureau of Investigation (FBI), being duly sworn, state:

4.      I am an investigator or law enforcement officer of the United States within the meaning of Title 18, United States Code, § 2510(7), empowered to conduct investigations of, and to make arrests for, the offenses enumerated in Title 18, United States Code, § 2516.

5.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have served in this role since May 2010.  I am currently assigned to the Sacramento Division, Stockton Resident Agency.  Prior to becoming a Special Agent, I completed 20 weeks of training (the FBI's Special Agent Basic Training Program) at the FBI Training Academy, Quantico, Virginia.  During this program, I received extensive training on all aspects of investigations and investigative methods, including human source handling, physical and electronic surveillance, interrogation methods, drug identification, criminal enterprises, drug trafficking, and financial investigations.  Additionally, I have received training in undercover investigations related to narcotics trafficking, which included investigative techniques and common subject behavior.

6.      While serving as an FBI Special Agent, I have investigated criminal violations relating to criminal street gangs, violent crime, and narcotics.  I have participated in all aspects of criminal

investigations, including interviews, physical surveillance, execution of search warrants, and the arrest of criminals.  I have personally investigated and/or assisted other agents and officers in their investigations involving violations of Title 21, United States Code, Section 841(a)(1), the manufacture, distribution, and possession with intent to distribute controlled substances; and Title 21, United States Code, Section 846, conspiracy to commit the foregoing.  Specifically, those investigations have focused on the distribution of methamphetamine, marijuana, cocaine, heroin, and other narcotics.  I am familiar with, and have participated in conventional investigative methods, including electronic surveillance, visual surveillance, the use of GPS/E-911 data, questioning witnesses, applying for and executing search warrants, handling confidential informants, and using pen registers and trap-and-trace devices.

7.    Through my training and experience, I have become familiar with the identification of various controlled substances, and the various methods used by drug traffickers to obtain, possess, transport, and/or sell controlled substances.  During my employment with the FBI, I have interviewed drug dealers, users, and confidential informants and have discussed with them the lifestyle, appearances, and habits and methods of drug dealers and users.  I have had the opportunity to talk with admitted and known drug traffickers as to their methods, and those of their associates, regarding the manufacture, importation, transportation, distribution and sales of controlled substances, as well as their methods used to conceal, transport, and launder cash and/or other types of drug proceeds.  I have become knowledgeable in the methods used by drug traffickers to import, conceal, transport, distribute, manufacture, and sell controlled substances, as well as the methods used to conceal, transport, and launder cash and/or other types of drug proceeds.  Through prior investigations and training, I have become familiar with the types and amounts of profits made by drug dealers, and the methods, language, and terms used by persons dealing illegal substances.  I know that drug traffickers often communicate with their associates through cellular telephones and landline telephones.  In addition, I know that drug traffickers frequently use multiple cellular telephones and landline telephones for a number of purposes, including to compartmentalize their illicit activities and associates; to separate illicit activity from legitimate activity; and to avoid detection from law enforcement.  I know that drug traffickers frequently change telephone numbers and cellular telephones in an effort to thwart law enforcement.  I know from my training and experience that drug traffickers often use fictitious names and identification when

Affidavit                                      3

1   subscribing (i.e., opening) cellular telephone and landline telephone accounts.  I also know that drug

2   traffickers put communications devices in the names of associates and/or relatives.  The use of these

3   fictitious names and identifications, or placing communication devices in the names of associates or

4   relatives, is designed to impede law enforcement investigations into the true subscriber and/or user of

5   such communication devices.

6           8.      I have personally led and participated in investigations of drug trafficking organizations

7   (DTOs) over the last twelve years.  I have interviewed members and associates of various DTOs.  During

8   the course of these investigations, I have conducted consensual monitoring, physical surveillance,

9   telephone analysis, wiretaps, search warrants, and arrest warrants.  I have been the affiant for six orders

10  authorizing wire and electronic communications.  I have monitored wire and electronic communications

11  in over half a dozen investigations.  I have conducted surveillance in support of over 12 wiretap

12  investigations.  During these investigations, I have spoken to experienced investigators and prosecutors

13  who have led and participated in other investigations to expand my knowledge base on drug trafficking

14  organizations, their methods, and ways to exploit their weaknesses.

15          9.      I am an "investigative or law enforcement officer of the United States" within the meaning

16  of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is

17  empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section

18  2516 of Title 18, United States Code.

19          10.     With respect to my application for warrants to obtain precise location data from cellular

20  phones, because this warrant seeks the prospective collection of information, including cell-site location

21  information, that may fall within the statutory definitions of information collected by a "pen register"

22  and/or "trap and trace device," see 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also

23  comply with the Pen Register Act.  See 18 U.S.C. §§ 3121-3127.  The requested warrant therefore

24  includes all the information required to be included in an order pursuant to that statute.  See 18 U.S.C. §

25  3123(b)(1).

26          11.     This affidavit is intended to show that there is sufficient probable cause for the requested

27  complaints, arrest warrants, and search warrants, and does not purport to set forth all of my knowledge of

28  the investigation of this matter.

Affidavit                                          4

III.    **PROBABLE CAUSE**

A.    **Synopsis and Background**

12.    Beginning in May 2019, Tracy PD conducted an investigation of a narcotics distributor in Stockton, CA identified by a Confidential Source ("CS").[1] The CS told investigators that a subject, later identified as MONTES, was a narcotics distributor. MONTES was an acquaintance of the CS prior to this investigation. In the following months, the CS, as directed by Tracy PD, successfully conducted three separate controlled purchases of methamphetamine from MONTES. In August 2019, the FBI joined the investigation of MONTES.

13.    On September 22, 2020, U.S. District Court Judge Kimberly J. Mueller authorized the intercept of wire and electronic communications for MONTES' PHONE, (209) 649-9267 (TT#1). 2:20-SW-0857 KJM (under seal). Intercepts commenced on September 24, 2020, and were completed on October 23, 2020.

14.    On November 24, 2020, U.S. District Court Judge Kimberly J. Mueller authorized the intercept of wire and electronic communications for ANDRADE's PHONE, (209) 954-6182 (TT#2); GARCIA-RUIZ's PHONE, (209) 594-6767 (TT#3); TINOCO's phone, (669) 210-4742; and wire communications only for GARCIA-RUIZ's phone, (209) 403-8715. 2:20-SW-0857 KJM (under seal). Intercepts commenced on November 27, 2020 and were completed on December 26, 2020. All narcotics purchased during the controlled buys referenced below tested presumptive positive for methamphetamine or cocaine. Below is a chart detailing the dates of these controlled buys and the narcotics the CS purchased from MONTES:

| Date | Narcotics Purchased | Price | MONTES' Source(s) |
|---|---|---|---|
| 5/18/2019 | 1.2 g methamphetamine | $100 | TBD |
| 7/23/2019 | 21.3 g methamphetamine | $200 | TBD |
| 8/23/2019 | 2 lbs (681.1 g) methamphetamine | $2,100 | TBD |
| 9/6/2019 | 2 lbs (674.1 g) methamphetamine | $2,100 | TBD |
| 1/24/2020 | 3 oz (70.1 g) cocaine | $4,200 | TBD |
| 9/29/2020 | 2 oz (30.4 g) cocaine | $3,400 | ANDRADE |

---

[1] Information regarding the CS's credibility is provided below.

Affidavit                                5

| 10/1/2020 | 2 oz (36 g) cocaine | $3,600 | ANDRADE |
|---|---|---|---|
| 10/6/2020 | 2 lbs methamphetamine | $7,580 | GARCIA-RUIZ, TINOCO |
| 10/13/2020 | 25 g cocaine | $3,600 | ANDRADE |
| 10/16/2020 | 3 lbs methamphetamine | $11,100 | GARCIA-RUIZ, TINOCO |
| 10/22/2020 | 2 lbs (835.8 g) methamphetamine | $7,400 | GARCIA-RUIZ |
| 12/8/2020 | 4 lbs methamphetamine | $13,600 | GARCIA-RUIZ, ESPINOZA |

15.    As discussed below, in addition to these controlled buys, the investigation also resulted in the seizure of $88,000 from HERNANDEZ on December 1, 2020; and the seizure of approximately 3,174.4 grams of cocaine, 940 grams of M30 oxycodone pills, and 15,855 grams of methamphetamine from TINOCO's storage unit on December 2, 2020.

**B.       The Confidential Source**

16.    The information obtained in this investigation originated from the CS.  The CS began working with Tracy PD in February 2017.  The FBI began jointly operating the CS in August 2019. Since the FBI joined this investigation, each of the CS's controlled purchase operations were recorded with audio and/or video recording equipment placed on the CS's person and/or in the CS's vehicle, and corroborated by law enforcement surveillance when possible.  All conversations between the CS and the targets of this investigation were in Spanish.  Translations of recordings in this affidavit were translated into English.  All reporting by the CS has been handled directly by the CS's Tracy PD handler as the CS's primary language is Spanish.

17.    The CS has a criminal history that includes a 1987 conviction for drunk driving on a highway; a 1988 and a 1989 conviction for possession of a controlled substance; 1988, 1992, and 1995 convictions for receiving known stolen property; a 1988 conviction for forge/alter vehicle registration; a 1988 conviction for use/under influence of a controlled substance; a 1992 conviction for assault with a deadly weapon, non-firearm; and a 2000 conviction and sentence for violation for Illegal Reentry Following Deportation.

18.    Tracy PD and the FBI have not identified any instances of dishonesty or unauthorized unlawful behavior by the CS.  The CS has conducted over 60 controlled firearms and/or narcotics purchases.  The CS is motivated by financial compensation and also consideration for immigration

benefits.  The CS conducted the first 20 controlled buys without any financial compensation.  Based on these facts and the corroboration of information provided by the CS, I find the CS to be reliable and trustworthy.

**C.      The TARGET SUBJECTS' Criminal Histories and Roles in the MONTES DTO**

19.      I have identified the TARGET SUBJECTS listed below have using the following information sources and criminal indices: the California Department of Motor Vehicles (DMV), the California Law Enforcement Teletype System (CLETS), the National Crime Information Center (NCIC), DEA, FBI, and Stockton Police Department's Records Management System (RMS), physical surveillance, conversations with other agents and officers participating in the investigation, and my own participation in the investigation.

   a.   MONTES has been identified as a methamphetamine and cocaine distributor based on intelligence gained during multiple controlled purchases of methamphetamine and cocaine from MONTES made by the CS.  MONTES' RESIDENCE has been identified through physical surveillance, electronic surveillance, commercial database queries, and the CS reporting as 2191 Orwood Ave, Stockton, CA 95205 (MONTES' RESIDENCE). MONTES is described as a Hispanic male with year of birth 1981; approximately 6'0" tall, 180 pounds with black hair and brown eyes.  MONTES has a California DMV ID Card /Driver's License issued to him, under number ending in 6175, with an associated photo of his likeness dated 2021.  MONTES' PHONE, (209) 649-9267 (TT#1), is serviced by T-MOBILE with the subscriber as Neftali Castillo of 2191 Orwood St, Stockton, CA (MONTES' RESIDENCE).  It does not appear that MONTES has any previous narcotic-related arrests, charges or convictions.  During the aforementioned wiretaps, MONTES would discuss narcotics deals which surveillance teams would then observe MONTES engaging in.

   b.   ANDRADE has been identified as a cocaine supplier to MONTES, based on intelligence gained during controlled purchases of cocaine from MONTES made by the CS. ANDRADE'S RESIDENCE has been identified through physical surveillance, DMV records, and an interview of ANDRADE to be 5301 E Main St, Stockton, CA 95215

(ANDRADE's RESIDENCE).  ANDRADE is described as a Hispanic male with a listed year of birth as 1988; approximately 6'1" tall, 205 pounds, with black hair and brown eyes. ANDRADE has a California DMV ID Card / Driver's License issued to him, with number ending in 5290, with an associated photo of his likeness dated 2020.  ANDRADE was employed as a correctional officer with the California Department of Corrections and Rehabilitation and has no known/identified criminal history. ANDRADE' PHONE (aka TT#2) is an AT&T associated phone number with a subscriber of C. A. at an address in Stockton, CA 95206.  During the aforementioned wiretaps, ANDRADE would discuss narcotics plans which surveillance teams would then observe ANDRADE engaging in.

c.  GARCIA-RUIZ has been identified as a large-scale methamphetamine distributor and co-conspirator with MONTES based on intelligence gained during multiple controlled purchases of methamphetamine from GARCIA-RUIZ and MONTES, made by the CS. During the investigation and the controlled buys discussed below, GARCIA-RUIZ's residence had been identified through physical surveillance, telephone subscriber records, financial records, and California DMV records as 3904 Red Oak Ln, Stockton, CA 95205. GARCIA-RUIZ is described as a Hispanic male with a listed year of birth as 1987; approximately 5'8" tall, 230 pounds, with brown hair and brown eyes.  GARCIA-RUIZ has a CA DMV ID Card / Driver's License issued to him, under number ending in 0862, with an associated photo of his likeness dated 2021.  GARCIA-RUIZ has a criminal history including convictions for driving under the influence (2009, 2011, 2012, 2012), domestic violence (2010), assault with a deadly weapon not firearm (2011), receiving known stolen property (2012), and throw substance at a vehicle (2013).  Based on call detail records, surveillance, and intercepted telephonic communications, GARCIA-RUIZ used (209) 594-6767 (TT#3) (subscribed to Walter Garcia at GARCIA-RUIZ's RESIDENCE) and (209) 403-8715 (no listed subscriber) (TT#4) to coordinate narcotics deals with his associates MONTES, TINOCO, and ESPINOZA.  GARCIA-RUIZ's PHONE is serviced by T-MOBILE.

d.  TINOCO has been identified as a large-volume trafficker of methamphetamine, cocaine,

1    and oxycodone.  During multiple controlled buys between the CS and MONTES,

2    MONTES contacted GARCIA-RUIZ, who then contacted TINOCO for

3    methamphetamine.  Through these controlled buys, wire intercepts, and surveillance, it

4    appears TINOCO's residence was at 3753 Oak Forest Ave, Stockton, CA 95205 .  After

5    agents conducted a search warrant of TINOCO's storage unit in early December 2020,

6    TINOCO has since moved out of the residence.  His current residence is not known.

7    TINOCO is described as a Hispanic male with year of birth being 1973, approximately

8    5'8" tall, 190 pounds. TINOCO has a CA DMV Driver's License Card issued to him,

9    under number ending in 3580.  Based on a series of controlled buys, surveillance, and wire

10   intercepts, TINOCO has been identified as the user of (669) 210-4742, a T-Mobile

11   associated phone number with no subscriber name or address.  TINOCO was identified on

12   two occasions as the supplier of methamphetamine for GARCIA-RUIZ (on October 6 and

13   16 of 2020).  TINOCO was also identified to have a storage unit containing a large

14   quantity of narcotics.  Agents discovered these narcotics during the execution of a search

15   warrant on December 2, 2020.

16   e.  HERNANDEZ has been identified as one of TINOCO's narcotics suppliers.  Agents

17       believe he obtained narcotics from Southern California and Mexico.  Through database

18       checks, law enforcement identified an address in  El Monte, CA as the residence of

19       HERNANDEZ during 2020.  On December 1, 2020, HERNANDEZ met with TINOCO to

20       drop off narcotics and pick up cash from TINOCO in Stockton.  While driving back to

21       southern California, a traffic stop of HERNANDEZ resulted in the seizure of $88,000 in

22       narcotics proceeds.  Subsequent wire intercepts indicated that HERNANDEZ had fled to

23       Mexico as a result of the seizure.  Based on wire intercepts of TINOCO's phone,

24       surveillance, and an interview of HERNANDEZ, HERNANDEZ has been identified as

25       the user of (602) 907-8569.   This number is a Sprint associated phone number with a

26       subscriber of J. C. at an address on Batful Street, El Monte, CA 91733.  HERNANDEZ

27       does not appear to have a criminal record.

28   f.  ESPINOZA has been identified as a multi-pound methamphetamine trafficker, based on

Affidavit                                                    9

intelligence gained during several controlled purchases of methamphetamine made by the CS through MONTES and GARCIA-RUIZ.  Wire intercepts indicated that MONTES sometimes obtained his narcotics from GARCIA-RUIZ, who then obtained his narcotics from ESPINOZA.    ESPINOZA is described as a Hispanic male with year of birth 1989; approximately 5'10" tall, 230 pounds, with brown hair and brown eyes.  ESPINOZA has a Mexican identification card issued to him and does not have a California driver's license or ID.  ESPINOZA has no criminal convictions in his criminal history.  Based on intercepted phone calls with GARCIA-RUIZ and surveillance, it is believed ESPINOZA used at least two different phone numbers, (209) 271-4440 and (209) 518-9892.  The carrier lists the subscriber of (209) 271-4440 as A. N. at an address in Stockton, CA 95205 and the carrier of (209) 518-9892 as R. L. of Stockton, CA 95206

**D.    Overt Acts Committed by TARGET SUBJECTS**

    **1.    *MONTES and Currently Unidentified Suppliers***

        **a)    May 18, 2019 – MONTES sold the CS 1.2 g of methamphetamine**

    11.    On May 18, 2019, investigators with the Tracy Police Department conducted a successful controlled purchase of 1.2 grams of methamphetamine for $100 from MONTES.  The CS met with MONTES in person.  The below is an excerpt of their conversation translated from Spanish:

| | |
|---|---|
| CS: | How much do you have right now? |
| MONTES: | I have the big ones, like the ones I showed you the other day. |
| CS: | I'm looking for the good quality ones. |
| MONTES: | Yeah, the good ones, even has some long ones.  But they're all the same, good quality.  (Pause)  Those guys were going to leave and then something happened. |

    12.    Based on my training and experience, I believe that after CS inquired about additional methamphetamine from MONTES.  MONTES confirmed that he had the "big ones."  "Big ones" has been used as a coded term to refer to methamphetamine.  Throughout this investigation, the CS has purchased pounds of methamphetamine, referred to as "big ones," and ounces of cocaine, referred to as "small ones."  The CS stated that   s/he was looking for good quality methamphetamine.  MONTES acknowledged his understanding of the quality of methamphetamine that the CS wanted.  Although it is

unclear who MONTES was referring to when he discussed "those guys," I believe based on the context of the conversation that these subjects were associated with MONTES' narcotics, likely his suppliers.

13. The narcotics the CS obtained from MONTES were subsequently turned over to investigators. A narcotics field test resulted in a presumptive positive result for methamphetamine.

**b)    July 23, 2019 – MONTES sold the CS 21.3 g of methamphetamine**

14. On July 23, 2019, investigators with Tracy PD conducted a successful controlled purchase of 21.3 grams of methamphetamine for $200 from MONTES. During the meeting, MONTES walked up to the CS holding a clear bag of crystalline substance which was handed to the CS. After the exchange of methamphetamine, the CS and MONTES had a conversation in Spanish which is translated below:

| | |
|---|---|
| CS: | So what about coke, right now? |
| MONTES: | There's none right now. I have to pay for the coke upfront. (Pause) Those guys sell in pounds, they don't sell by the ounce. |
| CS | What if I get a pound of meth and a pound of coke for next week? |
| MONTES: | Yeah, just be careful. I haven't seen them around here but they're around here. |
| CS: | I haven't seen any around here. |
| MONTES: | There will be some. There will be some. |
| CS: | That's cause I was going to LA and I wanted some now for the road. |
| MONTES: | Are you going right now, down south? |
| CS: | Yes, but can you assure me you'll have it next week? Call him to make sure. |
| MONTES: | Which one do you want? |
| CS: | The white one. |
| MONTES | An ounce? |
| CS: | No f*****, just an eighth, right now. |
| MONTES: | I don't think so right now. |
| CS: | I need to take a sample to my guy. I'm just going to take a hit to drive all the way to LA. I can't do it in front of my wife so I'll do it before we leave. My wife will hit me. |
| MONTES: | She'll knock you out, huh? Let me call first. |
| CS: | Call him. |

| | | |
|---|---|---|
| 1 | MONTES: | I don't think it's going to happen though.  They don't just sell an ounce. |
| 2 | CS: | How much is an ounce? |
| 3 | MONTES: | I don't know. |
| 4 | CS: | Ask him then, let me know. |
| 5 | MONTES: | I have to go and then I'll call you. |

15.     Based on my training and experience, the CS inquired about purchasing cocaine. MONTES responded that he did not have any and that "those guys," or his suppliers, only sold cocaine by the pound not by the ounce.  Pound quantities of cocaine are not a user amount. Rather, this amount indicates high-volume distribution. the CS inquired about a future purchase of both methamphetamine and cocaine. MONTES double-checked by asking which type of narcotic the CS wanted.  The CS confirmed   s/he wanted "the white one," which is a coded term for cocaine based on its white color. MONTES confirmed whether the CS wanted an ounce.  The CS clarified that   s/he wanted just an eighth of an ounce.  Later in the conversation,  MONTES stated that he didn't think he would be able to provide an eighth of an ounce of cocaine because "they," his cocaine suppliers, did not sell in ounce quantities.  I believe MONTES' statements about his suppliers dealing in pounds and not ounces indicates that MONTES is connected to high-volume narcotics suppliers.

16.     The narcotics the CS obtained from MONTES were subsequently turned over to investigators.  A narcotics field test resulted in a presumptive positive result for methamphetamine.

### c)    August 23, 2019 – MONTES sold the CS 681.1 g of methamphetamine

17.     On August 23, 2019, investigators successfully conducted a controlled narcotics purchase of 681.1 grams of methamphetamine for $2,100 between the CS and MONTES.  The CS was directed by MONTES to meet MONTES at his worksite in Stockton, CA.  MONTES asked the CS to go to the garage of the residence where the two spoke.  While in the garage, MONTES lifted up a tarp and showed the CS two long, rectangular packages wrapped in clear plastic.

18.     The CS departed from the meet location with 681.1 grams of methamphetamine.  The narcotics obtained by the CS tested presumptive positive for methamphetamine.

### d)    September 6, 2019  – MONTES sold the CS 674.1 g of methamphetamine

19.     On September 6, 2019, investigators successfully conducted a controlled buy of 674.1

1    grams of methamphetamine for $2,100 with MONTES.  This was the first controlled buy in which the

2    FBI was involved.  The CS pre-ordered methamphetamine and arranged to meet together with MONTES

3    in Stockton.  While the CS and MONTES were at the meet location, a second vehicle, driven by a male

4    subject (later identified as MONTES' brother), arrived.  The male subject of the vehicle placed a white

5    plastic bag into the CS's vehicle through the open driver's side window.  The white plastic bag contained

6    the methamphetamine which was later turned over to agents.  The suspected narcotics inside the bag were

7    tested and returned presumptive positive for methamphetamine.

8        **2.**    ***MONTES and ANDRADE – Conspiracy to Distribute Cocaine***

9        **a)**    **January 24, 2020 – MONTES sold the CS three ounces (70.1 g) of cocaine,**

10       **supplied by ANDRADE**

11       20.    On January 24, 2020, investigators conducted a controlled buy of three ounces of powder

12   cocaine from MONTES using the CS.  On that day, MONTES met the CS on three separate occasions.

13   During the first meeting, the CS ordered three ounces of cocaine from MONTES.  MONTES responded

14   that he would "go check" with his supplier and that he had to go to his supplier's house.  During the same

15   meeting at 4:53 pm, MONTES was heard on the CS's recorder placing a call to someone.  Toll records

16   later indicated that the call was to ANDRADE'S PHONE.  After the call, MONTES advised that he

17   would "go see if [MONTES' supplier] has [cocaine]."  MONTES and the CS agreed to meet later that

18   day.

19       21.    After MONTES departed, surveillance was maintained on MONTES, who stopped at

20   multiple locations, eventually returning back to his residence.  At 7:26 pm, surveillance observed a dark

21   truck arrive at MONTES' RESIDENCE.  Approximately two minutes later, surveillance observed the

22   dark truck depart from MONTES' RESIDENCE.  The license plate was confirmed to be CA 65288Y1.

23   DMV records showed it registered to Fidel Andrade Jr. or A. E. at an address in Stockton, CA.  I believe

24   that this vehicle is registered to ANDRADE, and that, based on subsequent observations and follow-up in

25   the investigation, that ANDRADE was driving this vehicle during this time.

26       22.    At 7:29 pm, approximately one minute after ANDRADE's truck departed MONTES'

27   RESIDENCE, the CS received a call from MONTES advising that he (MONTES) "only [had] two little

28   ones," or two ounces of cocaine.  MONTES and the CS agreed to meet at MONTES' RESIDENCE.

Affidavit                                13

23.    I believe that MONTES' statement that he had "two little ones" was confirmation that MONTES was able to obtain two ounces of cocaine from his supplier.  I believe that this meant MONTES had obtained these two ounces from between the time of MONTES' departure from the CS during their first meeting to the time of this call.   Specifically, I believe MONTES had just obtained the cocaine moments earlier when ANDRADE visited MONTES in his dark truck.

24.    After the CS arrived at MONTES' RESIDENCE, MONTES provided the CS with two ounces of cocaine which the CS paid $2,800.  The CS then asked MONTES if he would be able to get more cocaine since the CS wanted three ounces total.  MONTES was later heard on the CS's recorder speaking on his phone.  Toll records showed MONTES used his phone to call ANDRADE's PHONE.  Below is an excerpt of that call translated from Spanish:

MONTES:    [Speaking on his phone] Hey. (Pause)  Yes. (Pause)  Yes, call to say where to meet. (Pause)  Do you have two?  (Pause)

CS:    [Speaking to NC] One is good.

MONTES:    O.K.  It is good.

CS:    Yes, my tongue is numb.

25.    I believe that MONTES was speaking with ANDRADE about obtaining two additional ounces of cocaine for the CS.  At 7:53 pm, approximately two minutes later, MONTES received a call from ANDRADE's PHONE.  The CS's recorder was able to capture MONTES coordinating a meet location with ANDRADE.  I believe that MONTES received confirmation from ANDRADE in the call that ANDRADE would be able to provide MONTES with additional cocaine for the CS.  MONTES instructed the CS to go meet at the AM/PM located at Wilson Way and Highway 4 in Stockton.  MONTES departed from his residence and was surveilled to his first stop at ANDRADE'S RESIDENCE.  Surveillance observed an unidentified subject exit the residence and get into MONTES' RED/SILVER FORD on multiple occasions.  MONTES was then followed to the meet location.  During the meeting, MONTES and the CS waited in MONTES' RED/SILVER FORD.  MONTES did not provide the CS with the cocaine at this time.

26.    Shortly after, surveillance observed a white Toyota Rav4 drive up and park next to MONTES' RED/SILVER FORD.  MONTES got out of his vehicle and got into the passenger side of the

Rav4.  Approximately one minute later at 8:35 pm, MONTES exited the vehicle and entered his vehicle.  During this time, MONTES provided the CS with one ounce of cocaine, for which the CS paid $1,400.

27.    After the Rav4 departed, physical surveillance was maintained on the vehicle.  The vehicle license plate was identified as CA 8JTP260.  DMV registration records showed the vehicle to be a 2019 Toyota utility vehicle registered to EAN Holdings LLC at 14002 E 21st St SE 1500, Tulsa City, OK.  EAN Holdings is the company that operates Enterprise Car Rentals.  Follow-up of records for Enterprise Car Rentals showed that on the date of this controlled buy, January 24, 2020, the vehicle was rented to A. E. of Stockton, CA.  I know that A.E. is ANDRADE's wife.[2]  I believe ANDRADE was driving the white Rav4 and drove it to meet MONTES at the AM/PM where ANDRADE provided MONTES with one ounce of cocaine for the CS.  Surveillance was terminated after the white Rav4 was observed pulling into the garage of ANDRADE's RESIDENCE.

28.    After the controlled buy, the CS advised that  s/he was able to observe the driver of the white Rav4.  Agents showed a DMV photo of ANDRADE which the CS confirmed was the same subject that showed up to deliver the drugs to MONTES in the Rav4.

29.    I believe that on January 24, 2020, MONTES brokered two deals totaling three ounces of cocaine for the CS in which the supplier was ANDRADE.  A subsequent DEA lab test resulted in a net weight of approximately 70.1 grams (± 4.8 grams) of pure Cocaine Hydrochloride.  I believe ANDRADE drove the dark truck, later identified as a black Dodge Ram, and delivered two ounces of cocaine to MONTES at MONTES' RESIDENCE.  I also believe that ANDRADE drove the white Rav4 and delivered one ounce of cocaine to MONTES at the AM/PM.

**b)    September 29, 2020 – MONTES sold the CS two ounces (30.4 g) of cocaine, supplied by ANDRADE**

30.    On September 29, 2020, the CS was tasked to contact MONTES regarding the purchase of two ounces of cocaine which the CS had inquired about the day before, September 28, 2020.  the CS contacted MONTES (TT#1, Session #1336).  MONTES asked the CS, "Are you bringing me my check now, man?"  Based on training and experience, I know that "check" is a coded term often used by

---

[2] During an interview of ANDRADE on March 3, 2021, ANDRADE identified A.E. as his wife.

narcotics traffickers to refer to cash payment for narcotics.  MONTES was confirming with the CS s/he had cash and was ready to conduct the two-ounce cocaine deal.  The CS and MONTES agreed to meet together in an hour-and-a-half.

31.    During this controlled buy, wire intercepts were conducted of MONTES' PHONE. MONTES was intercepted calling ANDRADE's phone.  During the call, MONTES mentioned taking a "check" to ANDRADE and ANDRADE instructed MONTES to go over to ANDRADE's house.  TT#1, session #1345.

32.    Shortly after an in-person meeting between the CS and MONTES, MONTES advised the CS that he (MONTES) would go meet his supplier and instructed the CS to wait for MONTES at an Arco gas station.[3] Also during this meeting, MONTES received a call from ANDRADE.  TT#1, session #1350. Only portions of the conversation were intercepted.  Below is an excerpt of that conversation translated from Spanish:

ANDRADE:    Where are you?

MONTES:    I'm on my way.

ANDRADE    Because he/it[4] is about to arrive.

MONTES:    I'm on my way.

33.    I believe that ANDRADE explained he was asking where MONTES was because "he/it is about to arrive."  I believe the "he/it" was a reference to the cocaine MONTES was obtaining for the CS. After MONTES departed from the CS, MONTES' RED/SILVER FORD was observed via electronic surveillance[5] driving up to the driveway of ANDRADE's residence.  MONTES got out of his vehicle and walked towards the open garage where he met with a male subject, positively identified by agents as

---

[3] On January 24, 2020, during a previous controlled buy, MONTES had advised CS to wait for him (MONTES) at the same location. During that occasion, MONTES referred to the location as AM/PM.  On that January 24, 2020 date, ANDRADE was seen delivering the narcotics to MONTES at the gas station.

[4] Monitors were unable to specify if the word used was "he" or "it" since the Spanish term used could refer to either.

[5] Because of prior intelligence from the January 24, 2020 controlled buy at the Arco gas station, investigators conducted surveillance at ANDRADE's residence expecting MONTES to travel there.

Affidavit                                    16

1  ANDRADE.  MONTES stayed at the residence for four minutes.

2       34.     Shortly after MONTES departed the residence, he was observed driving to the Arco gas

3  station, where the CS was already waiting for MONTES.  Surveillance of ANDRADE'S RESIDENCE

4  showed a white Toyota Tacoma arrive at ANDRADE'S RESIDENCE.  ANDRADE entered the

5  passenger seat of the Tacoma and stayed there for three minutes before exiting the vehicle and entering

6  his own black Dodge Ram pick-up.  The Tacoma then departed, followed by ANDRADE in his black

7  Dodge Ram pick-up.  Surveillance was not available to follow both vehicles as they departed.

8       35.     Shortly after, while the CS and MONTES waited at the Arco gas station, ANDRADE

9  called MONTES advising MONTES that he was at the rims shop.  I know that adjacent to the Arco gas

10  station to the north is the Tire & Wheel Outlet.  At approximately the same time, surveillance drove by

11  the Tire & Wheel Outlet just north of the Arco gas station and observed a black Dodge Ram parked at the

12  business.  Surveillance observed MONTES walk to the black Ram and confirmed the truck's plate to be

13  6_ _ _ _ Y1 ("_" were characters that were not identified).  ANDRADE's black Ram has CA license

14  plate 65288Y1.  Although a partial license plate was observed, I believe the three characters observed

15  indicates that the black Ram observed at Tire & Wheel Outlet was ANDRADE's.



24  The photo above is from the CS's recorder capturing a black Dodge Ram (circled in red) parked on the top
right corner of the photo.  The black Dodge Ram is parked adjacent to a rack holding tire rims.  This vehicle
25  was the vehicle MONTES met with to obtain the cocaine.  The timestamp in video on this day was
approximately four minutes behind.  Actual time is 14:20:54 hrs. or 2:20:54 pm.
26

27       36.     The CS later reported that CS observed MONTES walk to the black Ram and then walk

28  towards and into the CS's vehicle, where MONTES placed something into the vehicle.  The CS then

went to her/his vehicle and observed that MONTES had placed a Ziploc bag containing a chunk of cocaine on the center console.  The CS then paid MONTES $3,400 for two ounces of cocaine.

37.    I believe that the cocaine the CS obtained from MONTES came from ANDRADE when the two met inside ANDRADE's black Dodge Ram at the Tire & Wheel Outlet.  The narcotics which the CS purchased from MONTES was later tested by a DEA lab.  Results showed a net weight of approximately 30.4 grams (± 2.7 grams) of pure Cocaine Hydrochloride.

> **c)    October 1, 2020 – MONTES obtained two ounces (36 g) of cocaine from ANDRADE**

38.    On September 30, 2020, the CS was tasked to set-up another two-ounce cocaine purchase with MONTES for October 1, 2020.  The CS called MONTES asking for "two babies,"  which was a coded term to refer to ounce quantities of cocaine.  TT#1, Session #1896.  Later, MONTES sent an outgoing text to ANDRADE stating, "[the CS's moniker] needs some."  I believe that MONTES was informing ANDRADE that the CS needed more cocaine.[6]  Immediately after this text, ANDRADE called MONTES.  In the call, MONTES stated, "[the CS's moniker] needs you to cut him two bunches."  TT#1, Session #1905.   ANDRADE stated he needed to talk to his "friend," which I believe is ANDRADE's supplier.

39.    Later on September 30, 2020, ANDRADE called MONTES, instructing MONTES to "tell [the CS] that it's yes… in the morning."  TT#1, Session #1909.  I believe ANDRADE had confirmed with his supplier and advised MONTES that he (MONTES) could inform the CS that they could conduct the deal the next day.

40.    On October 1, 2020, MONTES called ANDRADE who stated that he (ANDRADE) was waiting for his "friend" who was "going to come by shortly" in about "a half hour." TT#1, Session #2010.  I believe that ANDRADE was informing MONTES not to come yet because his supplier had not delivered the cocaine but would arrive in a half hour.  Surveillance later observed a white Toyota Tacoma

---

[6] I believe "some" is a reference to cocaine because ANDRADE had provided MONTES with cocaine to sell to CS one day prior (September 29, 2020).

park on ANDRADE'S RESIDENCE's driveway.[7]   ANDRADE sat in the front passenger seat of the vehicle for approximately two minutes.  The subject(s) in the Tacoma did not leave the vehicle and was not observed.

41.     Approximately one minute after the Tacoma departed, ANDRADE called MONTES informing MONTES that "It's on." TT#1, Session #2021.  I believe ANDRADE was telling MONTES that he had obtained the two ounces of cocaine.  MONTES responded, "Oh.  I'm on my way then." Approximately 16 minutes later, MONTES was observed at ANDRADE's RESIDENCE.

42.     Surveillance followed MONTES, who drove to a Home Depot in Stockton where he met with the CS.  During the meeting, the CS paid $3,600 for two ounces of cocaine.  MONTES provided the cocaine concealed in a Styrofoam cup to the CS.  A subsequent DEA lab test resulted in a net weight of approximately 36 grams (± 3 grams) of pure Cocaine Hydrochloride.



The CS's audio/video recorder captured MONTES meeting with the CS in MONTES' truck at Home Depot to conduct the cocaine deal.  The photo to the left shows a white Styrofoam cup on MONTES' lap. MONTES later gave this cup which contained cocaine to the CS.  The photo to the right shows MONTES counting the CS's cash payment for the cocaine.

---

[7] This white Toyota Tacoma was observed two days prior (September 29, 2020) driving to ANDRADE's residence and parking in the driveway prior to ANDRADE delivering two ounces of cocaine to MONTES.



After the operation, the CS turned over the Styrofoam cup to agents.  The cup contained the cocaine inside a clear plastic bag.

43.    I believe that ANDRADE obtained two ounces of cocaine from the subject in the white Tacoma, which prompted ANDRADE to tell MONTES, "It's on."  MONTES understood this to mean that ANDRADE obtained the cocaine which caused MONTES to tell ANDRADE that he was going to meet ANDRADE.  After meeting with ANDRADE and obtaining the cocaine, MONTES met and sold the cocaine to the CS.

**d)    October 13, 2020 – MONTES sold the CS 2 oz. (25 g) of cocaine, supplied by ANDRADE**

44.    On October 13, 2020,  the CS was tasked to conduct a two-ounce cocaine purchase with MONTES for the purpose of identifying ANDRADE's source of supply.[8]  The CS called MONTES asking for two ounces of cocaine.  After this call, MONTES used another phone which was not intercepted to call ANDRADE multiple times.  Investigators established surveillance on ANDRADE prior to contacting MONTES. Shortly after, surveillance positively identified ANDRADE, who exited his residence and was followed by surveillance.  ANDRADE eventually stopped at a residence located at on Caribbean Cir, Stockton, CA.[9]

---

[8] ANDRADE was identified on September 29 and October 1, 2020 as MONTES's cocaine supplier.  On both days, controlled purchases were conducted and surveillance was able to observe MONTES meeting with ANDRADE immediately prior to meeting with CS to conduct two-ounce cocaine deals.

[9] Investigators do not believe that residence is relevant to the investigation other then it being a house under renovation by ANDRADE.  Intercepts between MONTES and ANDRADE indicate that both are involved with "flipping" or renovating houses and then reselling them.  Investigators believe that

45.     Later, surveillance personnel who were surveilling ANDRADE at the Caribbean Cir residence observed MONTES' RED/SILVER FORD pick-up arrive at the residence.[10]  Surveillance positively identified MONTES exit the driver's seat of the vehicle where he met ANDRADE outside. After both subjects entered the residence briefly, MONTES exited the residence, entered his red/silver Ford, and departed. MONTES was under continuous surveillance and drove straight to his residence.

46.     Shortly after, the CS arrived at MONTES' RESIDENCE where the two met in the CS's vehicle.  During the meet, the CS purchased two ounces of cocaine from MONTES for $3,600.  A subsequent DEA lab test resulted in a net weight of approximately 25 grams (± 2.5 grams) of pure Cocaine Hydrochloride.

47.     I believe that based on other narcotics purchases for cocaine from MONTES that ANDRADE is MONTES' primary cocaine supplier.  I also believe that MONTES went to Caribbean Cir where he obtained the two ounces of cocaine from ANDRADE prior to driving to meet the CS at MONTES' RESIDENCE.

**e)     March 3, 2021 – Search warrant of ANDRADE'S RESIDENCE**

48.     On March 3, 2021, a search warrant was executed on ANDRADE's person, vehicles, and residence.  During the execution of the search warrants, agents interviewed ANDRADE.  After being advised of his Miranda Rights, ANDRADE agreed to speak with agents.  ANDRADE provided his phone number as TT#2 (this is the phone agents had intercepted).  ANDRADE told agents that he had cocaine at his residence.  ANDRADE had purchased one ounce of cocaine from a supplier approximately a few weeks earlier for $1,000.  ANDRADE did not disclose his supplier's identity.  Agents searched ANDRADE's RESIDENCE in the area which ANDRADE stated he stored the cocaine and found a plastic baggy containing a white powdery substance believed to be cocaine.  The gross weight of the cocaine and packaging was 59.7 grams.  ANDRADE also admitted to agents that he had been growing

---

ANDRADE went to this residence for the purpose of working on that house.  ANDRADE's trip from his residence to Caribbean Cir involved making a stop at a Wendy's drive-thru and also a Home Depot.

[10] Pings prior to MONTES arriving at Caribbean Cir showed him in Lodi.  Geolocation pings of MONTES's TT#1 were consistent with his statement to CS that he was in Lodi and needed to travel to Stockton to meet CS.

Affidavit                                                      21

marijuana in his backyard.  Agents found a greenhouse grow with 107 marijuana plants.  Agents also found three firearms at ANDRADE's RESIDENCE.

**3.**    ***MONTES, GARCIA RUIZ, TINOCO, and HERNANDEZ—Conspiracy to Distribute Methamphetamine***

**a)**    **October 6, 2020 – MONTES sold the CS 2 lbs (approximately 900.4 g) of methamphetamine, supplied by GARCIA-RUIZ and GARCIA-RUIZ's supplier, TINOCO**

49.    On October 6, 2020, the CS and MONTES met in-person and the CS ordered two pounds of methamphetamine.  At around the time of MONTES' departure from the meet location, MONTES called GARCIA-RUIZ's phone.  TT#1, Session #2922  Below is the call translated from Spanish:

> MONTES:         Are there two?
>
> GARCIA-RUIZ:    Two?
>
> MONTES:         Two.
>
> GARCIA-RUIZ:    I'll call you back.

50.    I believe that MONTES was calling to obtain "two" or two pounds of methamphetamine from GARCIA-RUIZ.  GARCIA-RUIZ responded that he would call MONTES back.  Approximately eight seconds after completing this call with MONTES, GARCIA-RUIZ called TINOCO.  As this outgoing call was GARCIA-RUIZ's first outgoing call since MONTES' original request for methamphetamine, I believe it was GARCIA-RUIZ reaching out to his supplier to obtain methamphetamine.  Further, the placing of this call immediately after the completion of MONTES' call just moments earlier indicates that this call was made because GARCIA-RUIZ was prompted by MONTES' call requesting two pounds of methamphetamine.

51.    Tolls showed that GARCIA-RUIZ and TINOCO had a series of exchanges over their phones.  After GARCIA-RUIZ received a call from TINOCO lasting 76 seconds, GARCIA-RUIZ called MONTES  to coordinate with MONTES to meet at his (GARCIA-RUIZ'S) residence.  GARCIA-RUIZ also elaborated that he needed an additional ten minutes because "the guy," or GARCIA-RUIZ's supplier, would be over at GARCIA-RUIZ's location in ten minutes.  During this time, MONTES, who was under physical surveillance, traveled to GARCIA-RUIZ's residence.  Surveillance personnel

1  maintained observation of GARCIA-RUIZ expecting that GARCIA-RUIZ's supplier would arrive and

2  deliver methamphetamine.

3       52.    Surveillance eventually observed MONTES depart from Red Oak Ln in his red/silver Ford

4  truck.  At the same time, a black Chevrolet pick-up drove up and parked in front of GARCIA-RUIZ's

5  residence.  I believe that the vehicle was driven by TINOCO.[11]  The black Chevrolet then drove up and

6  parked on the driveway.

7       53.    TINOCO exited the vehicle, reached into the bed of the Chevrolet pick-up and removed a

8  black bag.  TINOCO walked into the garage followed by GARCIA-RUIZ, who had also just retrieved a

9  black bag[12] from a waste bin on the driveway.  TINOCO stayed in the garage for approximately 45

10  seconds before re-entering the black Chevrolet and departing.  TINOCO was the only individual who

11  GARCIA-RUIZ had significant interaction with during the time the residence was under surveillance.[13]

12       54.    As the black Chevrolet departed, a green Dodge Caravan exited the garage of GARCIA-

13  RUIZ's residence.  Although the driver of the green Caravan was never observed, I believe it was driven

14  by GARCIA-RUIZ.  Surveillance followed both vehicles.  Approximately 0.1 miles away from

15  GARCIA-RUIZ's residence, surveillance observed the black Chevrolet pick-up park on the driveway of

16  what was later identified as TINOCO's residence.  Surveillance continued following the green Dodge

17  Caravan and observed it drive 0.5 miles away and park adjacent to MONTES' RED/SILVER FORD

18

19

20  [11] Surveillance later identified the license plate of the black Chevrolet pick-up to be CA 28874U1.  DMV
    records indicate the registered owner as Fernando Aldama Tinoco of 1509 E 8th St, Stockton, CA.
21  Although the driver of the black Chevrolet pick-up was not identified on October 6, 2020, the subsequent
    follow-up investigation leads me to believe that it was TINOCO.  I believe this because TINOCO was
22  observed on October 9, 2020 to be the driver of the black Chevrolet pick-up.

23  [12] Both black bags that were held by TINOCO and RUIZ-GARCIA appeared to be black backpacks or
    duffle-type bags and not black plastic bags.
24
    [13] GARCIA-RUIZ did have significant interactions also with MONTES but there was no indication that
25  RUIZ-GARCIA provided MONTES any narcotics while MONTES was at the Red Oak Ln residence.
    Calls with CS indicate that MONTES had not obtained methamphetamine while at GARCIA-RUIZ's
26  residence.  At 5:33 pm, a silver car arrived and double-parked in front of 3904 Red Oak Ln. GARCIA-
    RUIZ leaned into the front passenger side of the vehicle.  Surveillance confirmed that GARCIA-RUIZ did
27  not obtain any packages from this vehicle.  The vehicle stayed for approximately one minute before
    departing.  Investigators do not believe that this vehicle provided GARCIA-RUIZ with any narcotics
28  during that time.

1 truck.  GARCIA-RUIZ reached out and handed a black bag which I believe was a black backpack[14] out

2 of the driver's side window.  MONTES[15] reached out and grabbed the black bag through the driver's side

3 window.

4    55.    Surveillance was maintained on MONTES, who drove back to his residence where the CS

5 was waiting to conduct the two-pound methamphetamine deal.  MONTES removed a black backpack

6 from his red/silver Ford truck and placed it into the front passenger seat of the CS's vehicle. The CS paid

7 $7,580 for two pounds of methamphetamine.[16]

8    56.    On October 9, 2020, surveillance was established at 3753 Oak Forest Ln, Stockton, CA.

9 Agents positively identified Fernando Aldama TINOCO at the residence.  TINOCO departed from the

10 residence driving the same black Chevrolet pick-up, CA 28874U1, observed at GARCIA-RUIZ's

11 residence on October 6, 2020.  Surveillance personnel placed a call to the phone believed to be used by

12 TINOCO, TT#5.  While the call was made, surveillance observed TINOCO answering a phone

13 coinciding with the timing of the placed call.

14    57.    Based on surveillance and intercepted calls and texts, I believe that on October 6, 2020,

15 GARCIA-RUIZ coordinated the sale of two pounds of methamphetamine to MONTES.  I believe

16 MONTES' supplier, GARCIA-RUIZ, delivered methamphetamine to MONTES in the black bag.  I

17 believe the methamphetamine GARCIA-RUIZ obtained was delivered by the driver of the black

18 Chevrolet pick-up, TINOCO.  Subsequent surveillance confirmed that Fernando Aldama TINOCO was

19 likely the driver (as well as registered owner) of the black Chevrolet pick-up (CA 28874U1).[17]

20

21 [14] I reviewed surveillance video and the black bag appeared to be a backpack and not a black plastic bag.
Later when MONTES met with CS, MONTES provided the methamphetamine in a black backpack.  I
22 believe this black backpack was the bag that MONTES obtained from GARCIA-RUIZ when they met 0.5
miles from GARCIA-RUIZ's residence.
23

24 [15] Approximately two minutes after this exchange of the black bag, the red/silver Ford pick-up was
observed meeting with CS.  The driver of the red/silver Ford pick-up was again confirmed to be MONTES
25 through video surveillance and CS's video recorder.

26 [16] The original agreed-upon price for two pounds was $7,600 ($3,800 per pound).  However, CS
incorrectly counted the bundle of cash that was provided to MONTES and shorted MONTES $20, hence
27 the total payment of $7,580.  The narcotics tested presumptive positive for methamphetamine.

28 [17] During the time the CS ordered narcotics to the time the deal was completed on October 6, 2020,
GARCIA-RUIZ did have contact with four other numbers besides TINOCO's (669) 210-4742 number and
MONTES's phone.  However, contacts with those numbers during that time were all initially inbound

Affidavit                                    24

b)    **October 16, 2020 – MONTES sold the CS 3 lbs (875 g) of methamphetamine,[18]**

**supplied by GARCIA-RUIZ and GARCIA-RUIZ's supplier, TINOCO**

58.    On October 16, 2020, investigators tasked the CS to contact MONTES to coordinate a controlled buy of two pounds of methamphetamine.  The CS called MONTES asking for two "big ones."  TT#1, Session #5155.  Two minutes after this call, MONTES called GARCIA-RUIZ asking for "two big ones."  TT#1, Session #5160.  I believe that MONTES called GARCIA-RUIZ in order to try to fulfill the CS's request for two pounds of methamphetamine.  When MONTES asked GARCIA-RUIZ for "two big ones," this coded term was the same term used moments earlier with MONTES when the CS ordered the two pounds of methamphetamine.  In the call GARCIA-RUIZ stated that he only had one pound of methamphetamine and informed MONTES that he would have to call his "guy," or methamphetamine supplier, in order to obtain the additional methamphetamine.  GARCIA-RUIZ asked MONTES to "give me [GARCIA-RUIZ] five minutes.  Let me just call this guy right away."  I believe GARCIA-RUIZ needed five minutes to call his supplier to obtain more methamphetamine as he (GARCIA-RUIZ) only had one pound.

59.    Immediately after this call ended, GARCIA-RUIZ placed six outgoing calls to TINOCO.[19]  These calls were made in rapid succession; each call had a short duration, indicating that the calls likely did not connect.  I believe these calls were GARCIA-RUIZ's failed and repeated attempts to contact TINOCO to obtain methamphetamine for MONTES.

60.    Later, GARCIA-RUIZ informed MONTES that GARCIA-RUIZ was "at this guy's house

contacts. GARCIA-RUIZ's only contact with an associate which was initiated by him was an outbound contact with TINOCO's phone.  I believe that after GARCIA-RUIZ was prompted to obtain narcotics for MONTES, RUIZ-GARCIA's contacts with his supplier would likely be an outbound contact initiated by him seeking to obtain methamphetamine.  For all these reasons, I believe that TINOCO is GARCIA-RUIZ's methamphetamine supplier.

[18] MONTES obtained a total of three pounds of methamphetamine during two meets with RUIZ-GARCIA.  In the first meet, MONTES obtained two pounds and on the second meet MONTES obtained one more pound.

[19] Toll analysis of TT#3 showed that during this time period all outgoing calls were to (669) 210-4742.  TT#3 did receive one incoming call from (209) 395-2253 but since this call was incoming, it was likely not related to GARCIA-RUIZ's attempt to obtain methamphetamine.  GARCIA-RUIZ's second phone, (209) 395-4950 showed one incoming call and one outgoing call during this time but the duration of both calls was 4 seconds.  TT#4 showed no call activity during this time period.

1  to pick one up." TT#1, Session #5162.  I believe that GARCIA-RUIZ was informing MONTES that he

2  was at his supplier's house to pick up additional methamphetamine which he needed to complete

3  MONTES' request for two pounds.  Approximately four minutes after this call, surveillance personnel

4  observed a male subject resembling GARCIA-RUIZ standing outside of TINOCO's residence, which is

5  just two blocks away from GARCIA-RUIZ's residence.  I believe that GARCIA-RUIZ went to

6  TINOCO's residence to inquire about obtaining methamphetamine because he (GARCIA-RUIZ) had

7  tried to call TINOCO six times but was unsuccessful at getting a hold of TINOCO.  Surveillance

8  personnel also observed a silver Chevrolet Malibu parked on the driveway of TINOCO's residence.

9  Geolocation pings of TINOCO's phone provided very accurate locations showing that throughout that

10 day and during the time GARCIA-RUIZ was at TINOCO's residence, TINOCO's phone was located at

11 his (TINOCO's) residence.  I believe that since TINOCO's phone was at the residence, it is likely that

12 TINOCO was also at the residence.

13      61.      Surveillance personnel then observed the silver Malibu depart from TINOCO's residence;

14 the driver of the vehicle was not identified at the time, but is believed to be TINOCO.[20]  Surveillance was

15 maintained on the silver Malibu but was lost at 2:22 pm after it turned into StorQuest Self Storage,

16 approximately 2.5 miles from TINOCO's residence.  Geolocation pings for TINOCO's phone which

17 were previously showing the phone at TINOCO's residence then appeared near StorQuest Self Storage.[21]

18 Below is the location of ping 107 showing the approximate location of TINOCO's phone in relation to

19 the location of StorQuest Self Storage which is circled in red.

20

21

22

23

---

24 [20] Although TINOCO was not identified driving the Malibu when it left, approximately 22 minutes after
25 the Malibu departed, it arrived at GARCIA-RUIZ's residence.  The driver of the vehicle got out and was
   positively identified by surveillance personnel as TINOCO.

26 [21] Although the time of the geolocation ping is seven minutes after surveillance personnel observed
27 TINOCO's silver Chevrolet Malibu arrive at StorQuest Self Storage, I know that geolocation ping times
   are not always accurate and provide a general time frame.  I believe that even with the discrepancy in
28 time, the direction of travel of TINOCO's silver Chevrolet Malibu and the geolocations of TT#5 are
   consistent and show that the TT#5 was in the silver Chevrolet Malibu and by extension, TINOCO.



Ping of geolocation #107 at 2:29 pm in relation to StorQuest Self Storage (circled in red).

62.    After they lost the silver Malibu, surveillance personnel then concentrated surveillance back at GARCIA-RUIZ's residence.  Shortly after, they observed the same silver Malibu arrive at GARCIA-RUIZ's residence.  It was at this time that the driver was positively identified by surveillance personnel as TINOCO.

63.    Surveillance personnel observed TINOCO retrieve a black bag from the rear passenger seat.  At the same time, GARCIA-RUIZ exited the residence and then both subjects walked towards the residence.  TINOCO stayed for approximately two minutes before getting back into the silver Malibu and driving two blocks back to his residence.  GARCIA-RUIZ then departed from his residence in a red Camry parked on his driveway with another subject.  The Camry departed and was followed by agents. During the drive, MONTES called GARCIA-RUIZ, who advised MONTES that he was about to arrive to meet MONTES.  TT#1, Session 5186.  Around this time, the CS was instructed by agents to call MONTES asking for three pounds of methamphetamine instead of two pounds. MONTES confirmed that he could obtain it.

64.    Surveillance followed GARCIA-RUIZ's red Camry, which parked at a residence on  E Scotts Ave.[22] Parked in front of the red Camry was MONTES' RED/SILVER FORD truck and adjacent to the north of the red Camry was MONTES' brother's silver Ford truck.

65.    MONTES called GARCIA-RUIZ requesting another one pound from GARCIA-RUIZ.

---

[22] Based on other intercepts of MONTES's phone, MONTES was at this residence doing construction. This residence is not related to this investigation other than being a location where MONTES met GARCIA-RUIZ for two pounds of methamphetamine.

TT#1, Session #5188.  GARCIA-RUIZ told MONTES to "at least take these two here and I'll go bring you the other one right now."  I believe GARCIA-RUIZ instructed MONTES to take the two pounds of methamphetamine which he had in his possession and then he (GARCIA-RUIZ) would get the other one pound.  Surveillance observed MONTES retrieve a black bag from GARCIA-RUIZ's red Camry.  The red Camry departed from the location.

66.     The CS then arranged to meet with MONTES, where the CS purchased two pounds of methamphetamine for $7,400 from MONTES, who provided the methamphetamine in a black backpack. The CS stated  s/he wanted three pounds of methamphetamine, not two, to which MONTES stated he would "get the other one right now" and the two would meet again.  MONTES then drove away to obtain the additional one pound of methamphetamine.

 

The CS's recorder captured a photo (left) of MONTES holding a black backpack which MONTES had just retrieved from the bed of his truck.  The black backpack contained the methamphetamine MONTES sold to the CS.  Photo (right) of backpack the CS turned over to agents after the controlled buy containing two pounds of methamphetamine.

67.     During this time, surveillance was maintained on GARCIA-RUIZ, who traveled back to his residence.[23]  Surveillance later observed MONTES arrive and then enter GARCIA-RUIZ's residence. Shortly after, MONTES exited the residence holding an orange plastic bag in his hand.  MONTES departed and drove to meet the CHS to conduct the deal.

68.     At 4:22 pm, surveillance observed MONTES arrive at the pre-arranged meet location with the CS.  MONTES exited his vehicle, walked over to the passenger side of his truck and pulled out an

---

[23] Prior to GARCIA-RUIZ returning to his residence, the red Camry did make a stop in Stockton.  The stop did not appear to be related to the controlled buy.

orange plastic bag, which MONTES handed to the CS through the CS's front driver window.  During the meeting, the CS purchased another one pound of methamphetamine for $3,700.  The methamphetamine was later tested and resulted in a presumptive positive for methamphetamine.

69.    I believe on October 16, 2020, MONTES obtained a total of three pounds of methamphetamine from GARCIA-RUIZ.  GARCIA-RUIZ originally had one pound of methamphetamine available, but since MONTES needed two pounds for the CS, GARCIA-RUIZ reached out to his supplier, TINOCO, to obtain the additional methamphetamine.  GARCIA-RUIZ attempted to call TINOCO multiple times but was unsuccessful so he resorted to speaking to TINOCO in-person by going to TINOCO's residence just two blocks away from GARCIA-RUIZ's residence.  TINOCO then drove away to obtain the methamphetamine at the StorQuest Self Storage and then stop at GARCIA-RUIZ's residence where TINOCO dropped off the methamphetamine that GARCIA-RUIZ later delivered to MONTES.

70.    After the CS requested another one pound of methamphetamine, MONTES coordinated purchasing another one pound of methamphetamine from GARCIA-RUIZ.  MONTES traveled to GARCIA-RUIZ's residence and obtained the one pound of methamphetamine from GARCIA-RUIZ which was carried out of GARCIA-RUIZ's residence in the orange bag.  MONTES drove to meet the CS and provided the CS the one pound of methamphetamine in the orange bag.  A subsequent DEA lab test resulted in a net weight of approximately 875 grams (± 54 grams) of pure Methamphetamine Hydrochloride.

71.    I believe that the one pound of methamphetamine that GARCIA-RUIZ provided to MONTES was the original one pound of methamphetamine that GARCIA-RUIZ told MONTES that he had based on the difference in packaging of the two pounds GARCIA-RUIZ delivered and the one pound MONTES picked up later.  The two pounds GARCIA-RUIZ delivered in the black backpack came in a clear plastic bag.  The one-pound MONTES picked up from GARCIA-RUIZ was in a black plastic restaurant take-out tray with a clear plastic cover.

    c)    **October 22, 2020 – MONTES sold the CS 2 lbs of methamphetamine, supplied by GARCIA-RUIZ**

72.    On October 22, 2020, agents tasked the CS to conduct a controlled narcotics purchase

from MONTES.  The CS called MONTES to order cocaine.  MONTES stated there was not any
available, so the CS asked for methamphetamine.  Approximately two minutes after this call, tolls
showed MONTES use his other phone to contact GARCIA-RUIZ.  Surveillance was maintained on
GARCIA-RUIZ who was observed departing his residence in GARCIA-RUIZ'S Chevrolet Tahoe.

73.    Surveillance followed GARCIA-RUIZ who eventually stopped at 2706 E Roosevelt Ave,
Stockton, CA.  GARCIA-RUIZ walked to the backyard of the residence and retrieved a bag from a
vehicle parked in the backyard.  GARCIA-RUIZ was not observed interacting with anyone at the
residence, although there were short periods of time in which GARCIA-RUIZ was obscured from
surveillance.  GARCIA-RUIZ then proceeded to place the bag into the rear driver's seat and then enter
the driver's seat of GARCIA-RUIZ'S Tahoe where he proceeded to wait.

74.    GARCIA-RUIZ called MONTES on his other phone which was not intercepted.  I believe
that GARCIA-RUIZ was coordinating with MONTES as to where they would meet.  At approximately
the same time as the call, agents observed MONTES enter his RED/SILVER FORD truck and depart
from his residence.  Shortly after, GARCIA-RUIZ, who was at the Roosevelt residence, exited his
vehicle with a bag in his hand and walked towards the street.  At the same time, MONTES'
RED/SILVER FORD truck stopped at the E Roosevelt residence.

75.    After MONTES stopped his vehicle, GARCIA-RUIZ leaned into the front passenger
window and placed something in the bed of the truck.    GARCIA-RUIZ then walked back to his vehicle
without the bag in his hand.  MONTES drove away from the residence.  Surveillance was maintained on
MONTES.  MONTES was followed back to his residence where he met with the CS and conducted a
two-pound methamphetamine deal for $7,400.  A subsequent DEA lab test resulted in a net weight of
approximately 835.8 grams (± 51.4 grams) of pure Methamphetamine Hydrochloride.



The CS's recorder captured MONTES sitting in the CS's vehicle counting the CS's cash payment for the methamphetamine.

76.     I believe that after the CS ordered two pounds of methamphetamine, MONTES contacted GARCIA-RUIZ to obtain the methamphetamine.  GARCIA-RUIZ drove to 2760 E Roosevelt St., where he obtained a bag containing two pounds of methamphetamine from a vehicle parked in the backyard. GARCIA-RUIZ waited at the residence until MONTES arrived and placed the bag containing the methamphetamine in MONTES' RED/SILVER FORD.  MONTES then drove to his residence, where the CS was already waiting.  There at his residence, MONTES provided the CS with the two pounds of methamphetamine.

### d)     November 28, 2020 – HERNANDEZ' discussion with TINOCO about providing TINOCO narcotics

77.     On November 28, 2020, intercepts revealed a call between TINOCO and his narcotics supplier HERNANDEZ.[24]  TT#5, Session #58. In the call, TINOCO discussed obtaining money for HERNANDEZ and HERNANDEZ leaving narcotics for TINOCO.  Below are a few excerpts of that call, translated from Spanish:

TINOCO:         He was going to see him today, but he gets off work tonight. Let's see how much we have tomorrow. I think Avi will have everything, and I'll see if this guy can have 30 or all of it for me.

---

[24] On or about August 2020, the FBI identified Jesus Horacio Ramirez HERNANDEZ as a person involved with laundering drug proceeds and with distributing pound quantities of methamphetamine in Los Angeles County.  On an in-person, consensually made recording in August 2020, HERNANDEZ stated that he could obtain methamphetamines at $2,400 per pound.  On November 2, 2020 investigators placed a recorded ruse call to (602) 907-8569.  A task force officer who was familiar with the investigation and JESUS's voice was able to positively identify the user of the phone as JESUS.

HERNANDEZ:     All right.

TINOCO:        That way you can come over on Monday for sure so I can give you everything there is, Chuy.

HERNANDEZ:     Yeah.

TINOCO:        That way you can leave those three and we'll see how we get rid of them because it's really dead. I had forgotten it was the end of the month, so no wonder nobody calls. Nobody has called me, Chuy. Nobody.

HERNANDEZ:     Yeah, it's the end of the month.


78.    In this call, I believe that when TINOCO advised HERNANDEZ that he would "see how much we have tomorrow" he meant that he would see how much cash he would have tomorrow. Specifically, TINOCO believed that an associate identified as "Avi" would have everything, or all the money which Avi owed.  TINOCO would try to get "30" which I believe is coded language meaning $30,000.  I believe in this conversation, TINOCO was updating HERNANDEZ on how much narcotics proceeds TINOCO would be able to gather from TINOCO's distributors for HERNANDEZ.  TINOCO also stated that when HERNANDEZ came to see him (TINOCO) that HERNANDEZ could leave "those three" which I believe is a reference to a certain quantity of a narcotic.  TINOCO then discussed how narcotics sales had been slow.  Based on my training and experience, this collection of money is consistent with HERNANDEZ previously supplying TINOCO with narcotics and awaiting payment. The mention of HERNANDEZ bringing up "three" for TINOCO indicates that HERNANDEZ is TINOCO's supplier.

e)    **December 1, 2020 – HERNANDEZ's meeting with TINOCO and the seizure of $88,000 from HERNANDEZ**

79.    On December 1, 2020, TINOCO received a text from HERNANDEZ informing TINOCO, "I'm leaving".  I believe in this text, HERNANDEZ was informing TINOCO that he (HERNANDEZ) was leaving to meet TINOCO.  Later that morning, TINOCO called HERNANDEZ informing TINOCO that he (HERNANDEZ) was a few minutes away.  TT#5, Session #150.  Five minutes later, surveillance observed a white Nissan Sentra arrive at TINOCO's residence parking on the driveway.  The license plate of the vehicle was later confirmed to be CA 7ZZD056.  DMV records showed it registered to Jesus

1    H Ramirez Hernandez at a residence on Backford St, El Monte, CA.  Agents were able to positively

2    identify the driver as HERNANDEZ.



Photo at TINOCO's residence.  TINOCO (grey shirt) with HERNANDEZ (black jacket and baseball cap) meeting outside of TINOCO's residence after HERNANDEZ arrived.

80.    Shortly after, surveillance observed the garage door of the residence open.  TINOCO's black Chevrolet pick-up exited out of the garage and parked to the side of the driveway allowing the white Sentra to pull into the garage.  After the white Sentra pulled into the garage, the garage door closed.  Based on my training and experience, I believe that this was done for TINOCO and HERNANDEZ to access hidden compartments in the vehicle without the public being able to observe them.

81.    Surveillance was maintained on the residence and the white Sentra.  Later that afternoon, surveillance observed the garage door open and the white Sentra back out of the garage.  Surveillance was maintained on the white Sentra which traveled southbound on Highway 99.  The vehicle was stopped by the California Highway Patrol (CHP).  The driver, HERNANDEZ, provided consent to a search of the vehicle.  A search resulted in the identification of two hidden compartments under the two front seats; both compartments contained bundles of cash that were later determined to total $88,000.

82.    HERNANDEZ was detained and interviewed by a CHP detective and during the latter portion of the interview was telephonically interviewed by an FBI Task Force Officer (TFO).  During this portion when both investigators were present interviewing, HERNANDEZ admitted to working for a drug trafficking organization in which he transported not only bulk cash but also narcotics.  Below is an excerpt of that conversation:

TFO:             Okay, so I'll ask you again.  What else do you do for them?

HERNANDEZ:     Uh, uh, besides picking up money, I'd pick up stuff, the—the…

| | |
|---|---|
| 1 | TFO:          Okay, so where did you take the stuff? |
| 2 | HERNANDEZ:    Uh, I—I… |
| 3 | TFO:          [OV] You'd take it to different places or where they'd tell you? |
| 4 | HERNANDEZ:    Ah, yes, where they tell me. |

83.    I believe that when HERNANDEZ stated, "I'd pick up stuff," he was in fact using the term "stuff" to describe narcotics.  I believe HERNANDEZ was admitting to picking up and delivering narcotics as well as bulk cash.

84.    Later in the interview, HERNANDEZ admitted that he had picked up the money discovered in his vehicle from a friend in Stockton known only as "Fernando."  I believe that this "Fernando" from Stockton who HERNANDEZ described is in fact TINOCO.  A consent search of one of HERNANDEZ's phones resulted in the identification of a contact labeled as "Fernando Stocton" with the phone number agents knew to be used by TINOCO, TT#5.  I believe, based on prior intercepts between TINOCO and HERNANDEZ, that HERNANDEZ is one of TINOCO's narcotics suppliers and that HERNANDEZ had traveled to Stockton on December 1, 2020, in order to deliver narcotics to and to pick up narcotics payment from TINOCO.

      f)    **December 2, 2020 – Search warrant execution of TINOCO's storage unit, resulting in 7 lbs of cocaine, 2 lbs of M-30 pills, and 33 lbs of Methamphetamine**

85.    A review of surveillance video on December 1, 2020, of TINOCO's residence and geolocation pings of TINOCO's phone showed that after HERNANDEZ departed from TINOCO's residence on December 1, 2020, TINOCO also left his residence.  TINOCO departed at 5:28 pm, just 44 minutes after HERNANDEZ had departed from TINOCO's residence.  TINOCO departed in a black Chevrolet Malibu.  Approximately 15 minutes later, at 5:43 pm, TINOCO's phone showed a location at StorQuest Self Storage.[25]

86.    Follow-up conducted at StorQuest Self Storage allowed agents to positively confirm

_____

[25] This is the same StorQuest self Storage where surveillance observed TINOCO drive to during a controlled buy on October 16, 2020.

through security video at the facility that TINOCO was the driver of the black Chevrolet Malibu. TINOCO's entry code used to enter the facility showed he had access to storage unit C1556. Security video at the facility also showed TINOCO carrying a black tote with yellow cover towards unit C1556. When TINOCO departed from the storage unit, he was no longer carrying the same black/yellow tote.

87.    StorQuest also identified the renter for unit C1556 as O.H. The address on record for unit C1556 is 1509 E 8th St, Stockton, CA.[26] I know that this address is the same address on file with the DMV for the registration of TINOCO's black Chevrolet pick-up with license plate CA 28874U1 and for TINOCO's driver's license. I believe that O. H. is likely an associate of TINOCO's. I know that narcotics traffickers often use the identifying information of associates to insulate themselves from records involving cell phones, residences, vehicles, and even storage units.



StorQuest security video showing TINOCO carrying a black tote with yellow lid.

88.    Later, on December 2, 2020, I obtained a search warrant for TINOCO's storage unit located at StorQuest. An execution of the search warrant resulted in the discovery of the two of the same black plastic totes with a yellow lid which TINOCO was observed bringing into the storage unit. Inside the first tote was 21 packages of approximately one pound of methamphetamine each and three one-kilogram bricks of cocaine. Inside the second tote, agents found approximately twelve one-pound bags of methamphetamine. In all, agents seized approximately 3,174.4 grams of cocaine, 940 grams of M30 oxycodone pills, and 15,855 grams of methamphetamine.

---

[26] This address is the same address that was on file with the DMV for TINOCO's black Chevrolet pick-up bearing license plate CA 28874U1.

89.    I believe that HERNANDEZ was the supplier of TINOCO's narcotics.  Specifically, I believe that the set of facts obtained from intercepted communications between HERNANDEZ and TINOCO, their actual meeting on December 1, 2020, HERNANDEZ' being found with $88,000 after he departed from TINOCO's residence, HERNANDEZ's statements that he obtained the cash from his friend "Fernando" in Stockton, HERNANDEZ' departure from TINOCO's residence followed by TINOCO bringing the black/yellow tote into his storage unit and then the subsequent discovery of the narcotics inside TINOCO's storage unit is evidence indicating that HERNANDEZ provided TINOCO with a large quantity of narcotics which compelled TINOCO to immediately store the narcotics at his stash location at StorQuest after HERNANDEZ departed.

**g)    Additional probable cause regarding the conspiracy involving MONTES, GARCIA-RUIZ, TINOCO, and HERNANDEZ**

90.    After the seizure on December 2, 2020, I compared the manner of packaging of the approximately 33 pounds of methamphetamine seized in TINOCO's storage unit.  I noticed that the manner of packaging of the narcotics was identical to the packaging of methamphetamine MONTES sold to the CS on October 6 and October 16, 2020 (first buy of that day) in which MONTES obtained the methamphetamine from GARCIA-RUIZ who obtained it from TINOCO.  Below is a comparison of methamphetamine seized on these three dates.



Photo (left) methamphetamine from October 6, 2020 buy.  Photo (center) methamphetamine from October 16, 2020 buy.  Photo (right) methamphetamine from December 2, 2020 seizure from TINOCO's storage unit.

91.    I believe that the packaging of methamphetamine from all three dates is identical.  Each

packaging contained approximately one pound of methamphetamine.  The dimensions of the plastic bag are almost identical.  The plastic bags are also tied with a knot and the excess plastic bag above the knot was cut off in each instance.

92.    I further believe that the narcotics MONTES provided to the CS on October 6, and October 16, 2020 ultimately came from HERNANDEZ because the methamphetamine obtained during other controlled buys such as the buys on October 16,[27] October 22 and December 8, 2020 which did involve MONTES and GARCIA-RUIZ but not TINOCO were of a different kind of packaging.

  

Photo (left) methamphetamine from October 16, 2020's second buy.  Photo (center) methamphetamine from October 22, 2020 buy.  Photo (right) methamphetamine from December 8, 2020 buy.

93.    The packaging for these methamphetamine buys which did not involve TINOCO had uniquely different packaging from methamphetamine obtained from TINOCO.  On October 16, 2020, the packaging from the second buy of one pound of methamphetamine was a black takeout container with a clear lid.  The October 22 and December 8, 2020 packaging of methamphetamine involved the use of Ziploc bags with different colors.  The October 22, 2020 Ziploc bags had a pink opening while the

---

[27] The October 16, 2020 controlled buy involved GARCIA-RUIZ providing two pounds and then one pound of methamphetamine to MONTES.  GARCIA-RUIZ had told MONTES in a phone call that he already had one pound of methamphetamine.  GARCIA-RUIZ obtained two pounds from TINOCO.  After delivering the two pounds, GARCIA-RUIZ provided another one pound to MONTES.  This one pound of methamphetamine was packaged differently from the two pounds provided by TINOCO.  I believe this one pound was obtained by GARCIA-RUIZ from a different methamphetamine supplier which GARCIA-RUIZ had stored at his residence.

December 8, 2020 Ziploc bags had a blue opening.  Given the unique packaging method for the October 6, October 16 (first buy), and December 2, 2020 bags of methamphetamine, I believe that in all three instances, the methamphetamine provided was provided by HERNANDEZ, who supplied TINOCO, who supplied GARCIA-RUIZ, who supplied MONTES, and who ultimately supplied the CS.

### 4.    *December 8, 2020 – MONTES Sold the CS 4 lb. of Methamphetamine, Supplied by GARCIA-RUIZ and GARCIA-RUIZ's Supplier, ESPINOZA*

94.    On December 8, 2020, the CS was tasked to conduct a controlled buy with MONTES. Originally, the CS was tasked to purchase cocaine from MONTES but because MONTES had no access to cocaine, the CS was instructed to purchase methamphetamine from MONTES.  After multiple contacts with the CS, MONTES advised the CS that there was methamphetamine available.  The CS requested to purchase four pounds of methamphetamine from MONTES.

95.    Intercepts showed MONTES attempting to contact GARCIA-RUIZ six times; three of those times MONTES texted and three of those times MONTES called.  Based on the short duration of the calls and no replying texts from GARCIA-RUIZ, I believe that MONTES was unsuccessful at contacting GARCIA-RUIZ.  I also believe that these contacts were done as a direct result of the CS requesting four pounds of methamphetamine.  After unsuccessfully contacting GARCIA-RUIZ, MONTES received a return call from GARCIA-RUIZ.  TT#3, Session #2392.  In the call, MONTES asked for four pounds of methamphetamine.  Below is an excerpt of that call translated from Spanish:

| | |
|---|---|
| MONTES | I've been calling over and over. |
| GARCIA-RUIZ: | Go ahead. |
| MONTES | Well, that guy says he needs four. |
| GARCIA-RUIZ: | Okay, can I finish what I'm doing? |
| MONTES | Are you going to take long? Otherwise this guy will leave. |
| GARCIA-RUIZ: | Ah, I'm going to call my buddy right now and then I'll call you back. |
| MONTES | Will you let me know? |
| GARCIA-RUIZ: | Yes, I'll call you back right away. |
| MONTES | All right. |

Affidavit                                                              38

96.     I believe that after MONTES asked for four pounds of methamphetamine, GARCIA-RUIZ explained that he needed to "call [his methamphetamine supplier] right now and then [GARCIA-RUIZ would] call [MONTES] back."  Immediately after the completion of this call, GARCIA-RUIZ called ESPINOZA's phone asking ESPINOZA for four pounds of methamphetamine.  TT#3, Session #2395.  Below is an excerpt of that call translated from Spanish:

GARCIA-RUIZ:      Did you grab what I told you for my buddy?

ESPINOZA          No, not yet. Do you need today or what?

GARCIA-RUIZ:      Yes, I need four right now.

ESPINOZA          Let me check how these guys are doing.

97.     I believe that GARCIA-RUIZ had previously discussed obtaining methamphetamine from ESPINOZA which was why GARCIA-RUIZ started with an inquiry that did not request methamphetamine but asked if ESPINOZA had already grabbed what GARCIA-RUIZ had requested. ESPINOZA stated he had not obtained the methamphetamine and asked whether GARCIA-RUIZ needed it that day.  GARCIA-RUIZ responded that he needed "four right now" which I believe is the same four pounds of methamphetamine that MONTES requested when MONTES stated to GARCIA-RUIZ that "[the CS] says he needs four."  ESPINOZA responded that he had "nothing, or no methamphetamine available but that he would "let [GARCIA-RUIZ] know right now."  I believe ESPINOZA was informing GARCIA-RUIZ that ESPINOZA would check with his methamphetamine supplier and let GARCIA-RUIZ know as soon as possible whether methamphetamine was available.

98.     After GARCIA-RUIZ made multiple calls with ESPINOZA and MONTES, GARCIA-RUIZ called MONTES instructing him to receive the methamphetamine from GARCIA-RUIZ's supplier. Shortly after, ESPINOZA and GARCIA-RUIZ had a text exchange:

GARCIA-RUIZ:      Go to my buddy's.

GARCIA-RUIZ:      His house

ESPINOZA          By the park?

GARCIA-RUIZ:      Yes.

99.     I believe that GARCIA-RUIZ was instructing ESPINOZA to bring the methamphetamine directly to GARCIA-RUIZ's buddy's house, which I believe is MONTES' house.  Just earlier, GARCIA-

RUIZ had given MONTES similar instructions advising MONTES to be at MONTES' RESIDENCE to receive the methamphetamine.  GARCIA-RUIZ advised MONTES that his supplier would go to MONTES' RESIDENCE to give MONTES the methamphetamine.  GARCIA-RUIZ stated, "My buddy will go by and just give you that." TT#3, Session #2459.

100.    Agents conducted surveillance at MONTES' RESIDENCE and observed a black Dodge cargo van arrive at MONTES' RESIDENCE.  The vehicle had business signage for Quality Mobile Window Tint on its exterior.    The license plate was identified as CA 27738F2.[28]  MONTES was observed walking to the front driver's side door and opening the door.



Photo at MONTES' RESIDENCE.  ESPINOZA arrived in the black Dodge Ram van delivering methamphetamine to MONTES.  MONTES walked up to the front passenger door, opening the door. The photo above shows the white inner edge of the front passenger door ajar.

101.    At 3:51 pm, agents observed MONTES walk away from the black Ram van holding a white bag.  MONTES walked to his backyard and ESPINOZA departed in the black Ram van. Surveillance was not in place to follow ESPINOZA away.  After returning to his residence, MONTES called the CS instructing the CS to go to MONTES' house.  The CS eventually met with MONTES at his residence where they completed the methamphetamine deal.  The CS provided MONTES with $13,600 for four pounds of methamphetamine.  The CS departed from MONTES with the white bag with red symbol containing the methamphetamine.

---

[28] The registered owner of the vehicle is not currently involved in this investigation.



Photo of MONTES' RESIDENCE.  The CS (black jacket) meeting with MONTES (grey hoodie) for the methamphetamine deal in MONTES' backyard.

102.    Intercepts later showed ESPINOZA and GARCIA-RUIZ arranging to meet at GARCIA-RUIZ's residence.  Surveillance which was maintained at GARCIA-RUIZ's residence showed GARCIA-RUIZ arriving in a blue Chevrolet pick-up.  At the same time, agents observed ESPINOZA's black Dodge van drive down the street and park in front of GARCIA-RUIZ's residence.



Photo at GARCIA-RUIZ's RESIDENCE.  GARCIA-RUIZ (white t-shirt) meeting with ESPINOZA (red/black shirt).  ESPINOZA arrived in the black Dodge van; the same van observed at MONTES' RESIDENCE.

103.    ESPINOZA got out of the black Dodge van and met with GARCIA-RUIZ in front of his residence.  ESPINOZA wore a distinct black short-sleeve shirt that was red across the back shoulders, sleeves, and along the side of the shirt.  The same style shirt was found during a search warrant of ESPINOZA's residence on March 22, 2021.

104.    On March 22, 2021, a search warrant was executed at ESPINOZA's residence at 2916 Whittier Ct, Stockton, CA.  Agents found the same red/black shirt at the residence as the red/black shirt worn by ESPINOZA on December 8, 2020 in front of GARCIA-RUIZ's residence:



105.    Agents were also able to capture video of ESPINOZA.  It is important to note that during this surveillance operation, ESPINOZA was unidentified.  However, subsequent follow-up led to the positive identification of ESPINOZA.  Below are photos of ESPINOZA that allowed agents to later confirm that he was the driver of the black Dodge van.





December 8, 2020 photo (left) of ESPINOZA standing outside GARCIA-RUIZ's RESIDENCE. ESPINOZA is observed with a black jacket which was worn over the red/black shirt he was previously observed wearing.  Photo (center) of the Mexico ID card ESPINOZA provided to officers during a traffic stop on December 12, 2020.  Photo (right) at ESPINOZA's residence on March 17, 2021 of ESPINOZA departing his residence.  On March 22, 2021, the same individual observed on March 17, 2021 was positively identified as ESPINOZA when agents interviewed him.

106.    Surveillance was maintained on GARCIA-RUIZ's residence until ESPINOZA departed in his black Dodge van.  Surveillance was maintained on ESPINOZA's black Dodge van.  ESPINOZA drove through Stockton, eventually stopping at 2916 Whittier Ct, Stockton, CA.  The vehicle was parked partially blocking the driveway of 2916 Whittier Ct.  ESPINOZA got out and walked into the center breezeway of the two-unit building.  The center breezeway has access to 2916 and 2918 Whittier Ct.

107.    I believe that the series of calls and surveillance observations show that MONTES reached out to GARCIA-RUIZ for methamphetamine.  GARCIA-RUIZ in turn contacted ESPINOZA to obtain

1   the methamphetamine.  GARCIA-RUIZ arranged to have ESPINOZA deliver the methamphetamine to

2   MONTES' RESIDENCE.  After completing the delivery, ESPINOZA and GARCIA-RUIZ arranged to

3   meet at GARCIA-RUIZ's residence.

4           **a)      Identification of ESPINOZA as the user of (209) 271-4440**

5         108.    On December 12, 2020, surveillance was conducted at 2916 Whittier Ct which resulted in

6   the positive identification of ESPINOZA as the driver of the black Dodge van during the December 8,

7   2020 controlled buy.  During surveillance, agents observed a male subject, later identified as

8   ESPINOZA, drive away in a black GMC Sierra.  ESPINOZA resembled the driver of the black Dodge

9   van observed on December 8, 2020.  Surveillance was maintained on the vehicle after it left the

10  residence.

11        109.    A traffic stop was initiated on the black GMC Sierra and the driver, ESPINOZA, provided

12  Mexican identification identifying himself as Lauro Geovany Norzagaray Espinoza, year of birth 1989.

13  During the traffic stop, ESPINOZA stated that he lived at 2916 Whittier Ct, Stockton, CA and provided

14  his phone number (209) 271-4440; this is the same number that GARCIA-RUIZ contacted during the

15  December 8, 2020 controlled buy where GARCIA-RUIZ stated, "I need four [pounds of

16  methamphetamine] right now."  ESPINOZA also stated he owned a business, Quality Tint Mobile

17  Service.  I know that the black Dodge van observed on December 8, 2020 had business markings on its

18  exterior listing the business as Quality Tint Mobile Service.

19        110.    I believe this traffic stop positively identified ESPINOZA as GARCIA-RUIZ's narcotics

20  supplier who provided GARCIA-RUIZ with four pounds of methamphetamine on December 8, 2020.  I

21  also believe this connection established that ESPINOZA was the user of both (209) 271-4440 (based on

22  ESPINOZA's statements to police) and (209) 518-9892 (based on voice comparisons with (209) 271-

23  4440 and the corroborating surveillance observations on December 8, 2020).

24          **b)      March 22, 2021 – Search Warrant of ESPINOZA's residence at 2916 Whittier**

25                  **Ct, Stockton, CA**

26        111.    On March 22, 2021, a search warrant was executed on ESPINOZA, his vehicles, and his

27  residence.  During the execution of the search warrants, agents interviewed ESPINOZA.  ESPINOZA

28  was riding in the black Dodge van when agents made contact with ESPINOZA to conduct the interview.

After being advised of his Miranda Rights, ESPINOZA agreed to speak with agents.  ESPINOZA denied having possessed or sold narcotics.  ESPINOZA provided his personal phone number as (209) 271-4440 (the same number GARCIA-RUIZ contacted on December 8, 2020 asking for four pounds of methamphetamine).  Two firearms were found at ESPINOZA's residence.

***April 6, 2021 – Interview of MONTES and statements made by MONTES to the CS from August to December 2021***

112.   On April 7, 2021 law enforcement officers interviewed MONTES near his residence.  After being advised of his Miranda Rights, MONTES agreed to speak with officers.  MONTES did not provide significant information during the interview which is relevant to this complaint.  MONTES did provide his phone number, (209) 649-9267, also known as TT#1. During the interview, MONTES denied being involved with drugs.

113.   On August 10, 2021 MONTES and the CS met.  During the meeting, the CS asked if MONTES could get any drugs.  MONTES stated that he had not sold anything since questioned by law enforcement and did not want to be arrested and end up in prison.

114.   Around late November or early December 2021, the CS had a phone conversation with MONTES expressing concern that the CS was a criminal informant.  The CS denied being an informant and asked to purchase more narcotics.  MONTES stated he was trying to lay low but later explained that the only way they could do business was if the CS followed CASTILLO to his supplier's neighborhood and park a few blocks away where the CS would wait for MONTES to get the product.  MONTES explained that he didn't want to hold the product for long.

115.   I believe that even though MONTES did not admit to being involved with narcotics during his interview in April and that MONTES had made statements about not being involved with narcotics with the CS, MONTES is still willing and able to broker narcotics deals.  MONTES' statements about how a narcotics deal could happen if the CS was waiting near MONTES' narcotics supplier is indicative that MONTES was still interested in conducting narcotics deals even after he was interviewed by law enforcement in April 2021.

**E.     Additional Probable Cause to Support the Search of MONTES' RESIDENCE**

116.   On May 30, 2022, the CS met with MONTES.  During the meeting, the CS asked for

MONTES to obtain a price for two pounds of methamphetamine.  In the beginning, MONTES stated that his associates had gotten locked up and that he did not want to sell narcotics.  The CS stated that   s/he and her/his associates were ready to buy narcotics.  MONTES then agreed to contact his supplier to obtain prices for the CS.

117.    Based on my training and experience, and knowledge of this investigation, I believe the following:

a.  Narcotics trafficking is an ongoing or continuing criminal enterprise. Narcotic traffickers, or those that assist in that venture, maintain and tend to retain accounts or records of those transactions.  Drug traffickers tend to keep these accounts and records in their residence, vehicles, safes, storage containers, and in other areas under their control.

b.  Because narcotic traffickers frequently continue their criminal activity indefinitely, they keep records of their illegal activities for a period of time extending beyond the time during which they actually possess controlled substances, in order to maintain contact with criminal associates for future narcotics transactions, and to have records of prior transactions for which, for example, they might still be owed narcotic proceeds, or might owe someone else money.  Because possession of the documents themselves, unlike possession of narcotics, is not illegal, narcotic traffickers often fail to take precautions to destroy or conceal the documentation.  Therefore, documentation may survive for many months, sometimes years, after a large volume drug transaction has occurred, often in the traffickers' residences and vehicles.  Such documentation may be in hard copy form or stored in digital devices such as computers, cell telephones and other mobile communication devices.

c.  Individuals involved in narcotics trafficking commonly provide narcotics to trusted distributors in their organization on credit, and commonly obtain narcotics from their suppliers on credit.  Therefore, I am aware that individuals involved in narcotics trafficking maintain books, records, customer lists, receipts, notes, ledgers and other papers relating to the transportation, receipt, ordering, sales, and distribution of narcotics, narcotics proceeds, and equipment, and that such documents may be in code to thwart law

enforcement detection.  Such records often indicate the identity of co-conspirators.  The aforementioned books, records, receipts, notes, ledgers, correspondence, etc., are commonly maintained where the narcotics traffickers have ready access to them, i.e., homes, offices, and automobiles.  Such documentation may be in hard copy form or stored in digital devices such as computers, cell telephones and other mobile communication devices.

d.  Drug traffickers often place their assets in names other than their own to avoid detection of those assets by law enforcement; those persons are commonly family members, spouses or companions, friends, and associates who accept title of assets to help the trafficker avoid discovery and detection.

e.  Individuals involved in narcotics trafficking will conduct narcotics-related activities at various locations and residences in an effort to avoid law enforcement detection.

f.  Individuals involved in narcotics trafficking often conceal evidence of their drug trafficking, including narcotics and narcotics proceeds, in their residences, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings.  They also conceal evidence in vehicles, including vehicles outside of their residences, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses.

g.  Narcotics traffickers often utilize vehicles to transport and distribute controlled substances in facilitation of their trafficking activities.  Traffickers will also utilize vehicles as locations to store controlled substances prior to distribution.  Large-scale traffickers will often use vehicles with hidden compartments, also known as traps, to store narcotics or narcotics proceeds in order to conceal the presence of such contraband from law enforcement.  Narcotics traffickers will often utilize vehicles registered in the names of individuals other than themselves in an effort to avoid detection by law enforcement.

h.  Individuals involved in narcotics trafficking commonly use certain paraphernalia to package and prepare controlled substances for distribution (such as tupperware,

cellophane, heat sealers, gylcine or plastic baggies, latex gloves, cutting agents and dilutents, chemical testing devices, triple beam scales and other weighing devices, measuring devices, strainers, compression devices, etc.). Individuals involved in narcotics trafficking commonly store these items in their residences, garages, outbuildings, storage areas, carports, and in the residences of friends or relatives, in their vehicles, and in other areas to which the traffickers have ready access.

i.  Individuals involved in narcotics trafficking generally sell narcotics for cash proceeds. Narcotics traffickers often have on hand large amounts of United States currency in order to maintain and finance their ongoing business. Narcotics traffickers often keep large sums of currency, caches of narcotics, financial instruments, precious metals, jewelry, automobiles, and other items of value and/or proceeds of narcotic transactions, including evidence of financial transactions related to obtaining, transferring, secreting, or spending large sums of money acquired from engaging in the acquisition and distribution of controlled substances in their residence, vehicles, safes, storage containers, and in other areas under their control.

j.  Unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

k.  Individuals involved in narcotics trafficking often launder money obtained through illegal drug transactions through legitimate businesses. Traffickers who are involved in such money laundering often structure financial transactions to avoid reporting requirements, and often keep records of their activities and financial transactions. To escape detection, however, they mix and intermingle those records with records of lawful transactions. In such instances, it is necessary to analyze the entire record to isolate the records of unlawful transactions, and it is not feasible to extract the records of unlawful activities without such analysis.

l.  Additionally, when narcotics traffickers amass large quantities of cash from the sale of narcotics, they will sometimes attempt to legitimize these profits through the use of banks and financial institutions and their services, including accounts, securities, traveler's

Affidavit                                   47

checks, cashiers' checks, money orders, wire transfers, certificates of deposit, and safe
deposit boxes.  Records from such transactions are often maintained in residences, offices,
garages, storage buildings, automobiles, and safe deposit boxes.

m.  Narcotics traffickers typically will obtain and distribute controlled substances on a regular
basis, as a distributor of a legitimate commodity would purchase stock for sale such
narcotics traffickers will also have an "inventory" which will fluctuate in size depending
on the demand for the product.

n.  Narcotics traffickers commonly have in their possession (that is, on their person, at their
residence, and in areas under their control), firearms, including, but not limited to,
handguns, pistols, revolvers, rifles, shotguns, machine guns, silencers, and other weapons.
Such firearms are used to protect and secure a trafficker's property.  Such property may
include, but is not limited to, narcotics and other dangerous drugs, jewelry, narcotics
paraphernalia, books, records, ledgers, and quantities of currency related to their drug
trafficking activity.

o.  Narcotics traffickers may take or cause to be taken, photographs, videotapes, or other
recordings of themselves, their associates, their property, and their product.  Such
traffickers often maintain photographs and/or videotapes at their residences or in the areas
under their control.

p.  Narcotics traffickers may maintain in their possession or at their residence fictitious
identification, including, but not limited to, drivers licenses, employment cards, insurance
cards, social security cards, naturalization records, certificates of birth and passports
which are obtained by the traffickers and utilized in an effort to prevent law enforcement
identification of the traffickers and their narcotic trafficking activity.

q.  Individuals involved in narcotics trafficking often use cellular telephones and other
communication devices sometimes in fictitious and/or other individual's names.
Traffickers commonly receive telephone calls, voicemail messages and text messages
from individuals seeking to conduct narcotics transactions.  As a result, traffickers often
maintain in their residences, vehicles, and locations where they conduct transactions,

records and items that reflect or contain names, addresses, and/or telephone numbers for their associates and co-conspirators in the DTO.  These records and items include telephone address books and telephone listings, text messages, voicemails, as well as letters, telephone bills, e-mails, and personal notes reflecting names, identities, addresses, and telephone numbers.  Traffickers often keep records and evidence of their illegal activities for a period of time extending beyond during which they actually possessed illegal narcotics and controlled substances, in order to maintain contact with their criminal associates for future narcotic transactions, and so that they can have records of prior transactions for which a trafficker might still be owed money, or might owe someone else money.

r.    Individuals involved in narcotics trafficking often use various locations to serve different functions so that customers, thieves, and law enforcement do not learn about any one location where large quantities of narcotics, money, and/or other narcotic-related assets are stored.  Therefore, one or more locations are often used to store lesser amounts of narcotics, money, and/or narcotics-related assets, and additional locations are used to meet customers.

118.    It is my opinion, based on my training and experience, and the training and experience of other law enforcement investigators with whom I have spoken, that the items listed in the Attachment B, as they relate to narcotics trafficking offenses, which are incorporated into this affidavit by reference, are items often associated with the trafficking and distribution of controlled substances, including, but not limited to, methamphetamine, crack cocaine, marijuana, and prescription pills, as well as the proceeds from such illegal operations.

**F.    Probable Cause to Believe that MONTES Currently Resides at the MONTES' RESIDENCE, is Using MONTES' PHONE, and Drives MONTES' RED/SILVER FORD.**

119.    On May 2, 2022, surveillance observed MONTES at MONTES' RESIDENCE. MONTES was observed driving a vehicle backing it into the backyard.

120.    In May 2022, subscriber records for MONTES' previously identified phone, (209) 649-9267, showed that the phone was still subscribed to MONTES as of May 16, 2022.  The subscriber was

Affidavit                                                    49

1    identified as Neftali Castillo of 2191 Orwood St, Stockton, CA 95205-3225.

2          121.    On May 29, 2022, DMV record checks for MONTES' RED/SILVER FORD showed the

3    vehicle registered to Neftali Montes Castillo of 2191 Orwood St, Stockton, CA 95205.

4    **G.    Probable Cause to Believe that GARCIA-RUIZ Uses GARCIA-RUIZ's PHONE.**

5          122.    On May 4, 2022, an associate of GARCIA-RUIZ identified as M.V. made a police report.

6    In the report, M.V. stated s/he had observed GARCIA-RUIZ driving a blue Chevrolet Silverado with CA

7    license plate 5X61374.  The vehicle is registered to M.V. but is driven by both M.V. and GARCIA-

8    RUIZ.  M.V. also provided police with GARCIA-RUIZ's phone number as (209) 594-6767 (GARCIA-

9    RUIZ's PHONE).   As of May 15, 2022, cellular carrier records showed that (209) 594-6767, was

10   subscribed to Walter Garcia of 3904 Red Oak Lane, Stockton, CA.

11   **H.    Probable Cause to Believe that ANDRADE Resides at ANDRADE'S RESIDENCE and**

12   **uses ANDRADE'S PHONE.**

13         123.    In May 2022, subscriber records for ANDRADE's previously identified phone, (209) 954-

14   6182 (TT#2), showed that the phone was still subscribed to ANDRADE's wife as of May 17, 2022.  I

15   believe that ANDRADE is still using this phone.

16         124.    On May 24, 2022, surveillance observed ANDRADE's black Dodge Ram parked on the

17   driveway of 5301 E Main St, Stockton, CA.  DMV records reveal that this Dodge Ram is registered to

18   Fidel Andrade Jr. or A.E. at a residence in Stockton.

19   **I.    Probable Cause to Believe that ESPINOZA Uses ESPINOZA's PHONE.**

20         125.    In May 2022, agents attempted to locate ESPINOZA at his residence at 2916 Whittier Ct.

21   Based on surveillance and database checks, agents concluded that ESPINOZA was no longer living at the

22   residence.

23         126.    Database checks of ESPINOZA partner, E.G., showed a recent associated address at 3404

24   Starwood Ln, Bakersfield, CA.  Open-source records showed that the residence is also an address of

25   record for Pro Tint Mobile Services, a mobile tint business.  Social media accounts for the business

26   showed a white cargo van similar to the van ESPINOZA was driving on December 8, 2020.  Database

27   checks for the business showed it was associated with a S.R.  Database checks for S.R. showed s/he to be

28   a relative of E.G.; S.R. has an alias with the same last name as E.G.  DMV records for S.R. showed that

Affidavit                                      50

1  s/he is the registered owner of a Ford van, CA 14555J2.   License plate captures of CA 14555J2 returned

2  with photos of an identical Ford van with signage identifying it as Pro Tint Mobile Services.

 

License plate reader capture of CA 14555J2 (photos above).  The below photo was from Pro Tint Mobile
Services' social media page.  Both sets of photos feature the phone number (661) 316-9777
(ESPINOZA's PHONE) and similar decals for social media sites Facebook, Instagram, and Google.



20     127.     On May 24, 2022, agents conducted a ruse call to Pro Tint Mobile Service, a business

21  located at 3404 Starwood Ln, Bakersfield, CA.  The business number agents contacted was

22  ESPINOZA'S PHONE; this number was listed on the business' social media pages.  During the call,

23  agents confirmed with the user of the phone that the number belonged to Pro Tint Mobile Services.  The

24  user of the phone also self-identified as "Geo."  A social media account for Pro Tint Mobile Services

25  shows a van parked on the driveway of a residence that agents were able to positively identify as 3404

26  Starwood Ln, Bakersfield, CA.  I believe "Geo" is ESPINOZA as that is the name he had provided to

27  agents during ruse calls in March 2021 prior to a search warrant being executed on his mobile tint van in

28  Stockton, CA.  I believe that ESPINOZA has moved to Bakersfield and has started a new business, Pro

Affidavit                                51

Tint Mobile Service and is the user of ESPINOZA'S PHONE.

### IV.    TRAINING AND EXPERIENCE REGARDING CELLULAR TELEPHONES AND PRECISE LOCATION DATA

128.    In my training and experience, I have learned that T-Mobile, AT&T, and Verizon are all companies that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records.  E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data is typically less precise that E-911 Phase II data.

129.    Based on my training and experience, I know that these carriers can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on their network or with such other reference points as may be reasonably available.

130.    Based on my training and experience, I know that these carriers can collect cell-site data about the Target Cell Phone.  Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication.  I also know that wireless providers typically collect and retain cell-site data pertaining to cellular devices to which they provide

service in their normal course of business in order to use this information for various business-related purposes.

## V.    AUTHORIZATION REQUEST REGARDING APPLICATION FOR WARRANTS TO OBTAIN PRECISE LOCATION DATA FROM A CELLULAR TELEPHONE

131.    Based  on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

132.    I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  See 18 U.S.C. § 3103a(b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property.  See 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.  See 18 U.S.C. § 3103a(b)(2).

133.    I further request that the Court direct the respective carriers to disclose to the government any information described in Attachment B that is within the possession, custody, or control of the respective carriers.  I also request that the Court direct the respective carriers to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the respective carriers' services, including by initiating a signal to determine the location of the Target Cell Phone on the respective carriers' network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall reasonably compensate the respective carriers for reasonable expenses incurred in furnishing such facilities or assistance.

Affidavit

134.    I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

## VI.    REQUEST FOR SEALING

135.    It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

## VII.    CONCLUSION

136.    Based on my training, experience, and the information contained within this affidavit, I believe that probable cause exists to believe the TARGET SUBJECTS committed the TARGET OFFENSES below:

| Count | Target Subjects | Target Offenses | Dates |
|---|---|---|---|
| I | MONTES & ANDRADE | Conspiracy to Distribute Cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) | 1/24/2020 – 10/13/2020 |
| II | MONTES, GARCIA-RUIZ, TINOCO, & HERNANDEZ | Conspiracy to Distribute Methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) | 10/6/2020 - 12/2/2020 |
| III | MONTES, GARCIA-RUIZ, & ESPINOZA | Distribution of Methamphetamine, in violation of 21 § 841(a)(1) | 12/8/2020 |

//

//

//

//

Affidavit                                    54

137.    Also based on the foregoing, I submit there is probable cause to search the people and property described in ATTACHMENTS A-1 through A-8 for the items described in ATTACHMENTS B-1 through B-8.  I also submit that there is probable cause to arrest the TARGET SUBJECTS for violations of the TARGET OFFENSES described in the table above.

Respectfully submitted,


 /s/ Brian Toy
BRIAN TOY
Special Agent
FBI


Subscribed and sworn to me via telephone on:    June 1, 2022

Hon. Jeremy D. Peterson
U.S. MAGISTRATE JUDGE


/s/ Adrian T. Kinsella
Approved as to form by AUSA ADRIAN T. KINSELLA

In addition, with regard to the request for warrants to obtain precise location data from the target cellular telephones, to ensure technical compliance with 18 U.S.C. §§ 3121-3127, I also request that this warrant shall also function as a pen register order.  I thus certify that the information, under oath, that likely to be obtained is relevant to an ongoing criminal investigation conducted by the FBI, based on the agent's affidavit herein.  *See* 18 U.S.C. §§ 3122(b), 3123(b).

<u>United States v. JESUS HORACIO RAMIREZ HERNANDEZ ET AL</u>
**Penalties for Criminal Complaint**

**<u>Defendants</u>**
**JESUS HORACIO RAMIREZ HERNANDEZ**
**FERNANDO ALDAMA TINOCO**
**GEOVANY ESPINOZA**
**WALTER GARCIA-RUIZ**
**FIDEL ANDRADE**
**NEFTALI CASTILLO MONTES**

**<u>COUNT 1:</u>**            **ANDRADE & MONTES**

VIOLATION:        21 U.S.C. §§ 846, 841(a)(1) – Conspiracy to Distribute Cocaine

PENALTIES:        A maximum of up to 20 years in prison; or
Fine of up to $1,000,000; or both fine and imprisonment
Supervised release of at least 3 years up to life

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**<u>COUNT 2:</u>**            **HERNANDEZ, TINOCO, GARCIA-RUIZ, & MONTES**

VIOLATION:        21 U.S.C. §§ 846, 841(a)(1) - Conspiracy to Distribute Over 500 Grams of
a mixture containing Methamphetamine

PENALTIES:        Mandatory minimum of 10 years in prison and a maximum of up to life in
prison; or
Fine of up to $10,000,000; or both fine and imprisonment
Supervised release of at least 5 years up to life

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**<u>COUNT 3:</u>**            **ESPINOZA, GARCIA-RUIZ, & MONTES**

VIOLATION:        21 U.S.C. § 841(a)(1) - Distribute of Over 500 Grams of a mixture
containing Methamphetamine

PENALTIES:        Mandatory minimum of 10 years in prison and a maximum of up to life in
prison; or
Fine of up to $10,000,000; or both fine and imprisonment
Supervised release of at least 5 years up to life

SPECIAL ASSESSMENT: $100 (mandatory on each count)